EDWARD P. GLOR and FRANK F. GLOR, Appellants, *v.* JAMES W. H. KELLY, as Administrator of the Estate of JAMES H. KELLY, Deceased, Respondent.

*Principal and agent — what acquiescence by the principal will constitute a ratification of a settlement by the agent of a claim against a third party.*

A vendee of goods sold by an agent, in response to a demand for payment by the agent's principals, replied that he had "settled" with the agent. The principals made no further demand upon the vendee during his lifetime, but sought payment from the agent, who replied that they must look to him, and that he would settle with them when he received certain money which was due him. The principals replied that that arrangement was satisfactory and that they hoped the agent would settle the account as soon as he received such money. The efforts of the principals to secure payment from the agent continued for at least six months, but the agent died without having made such payment, leaving an estate which was probably insolvent.

In an action brought by the principals against the administrator of the vendee to recover the purchase price of the goods it was

*Held,* that a nonsuit was properly granted;

That the principals, having elected to ratify the settlement made with the agent, could not disavow such ratification after the death of the vendee and the agent.

MCLENNAN and WILLIAMS, JJ., dissented on the ground that the nonsuit erroneously proceeded upon the theory that the vendee had actually paid the agent for the goods.

APPEAL by the plaintiffs, Edward P. Glor and another, from a final judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Niagara on the 29th day of November, 1899, upon the dismissal of the complaint by direction of the court after a trial before the court and a jury at the Niagara Trial Term.

*Henry Adsit Bull,* for the appellants.

*P. F. King,* for the respondent.

SPRING, J.:

The plaintiffs were copartners in the business of manufacturing barrels in the city of Buffalo. In July, 1896, they established a branch factory at Lewiston in Niagara county. This manufactory

was in a shop owned by one Carney. The plaintiffs and Carney entered into an arrangement whereby they were to ship stock to their order, which was to be received by Carney, put together into barrels, and to be sold by him, and the profits, if any, were to be divided equally between them. The title to the stock and barrels, however, was to remain in the plaintiffs until sold, and Carney was to act as the agent of the plaintiffs. This project was carried out and the plaintiffs furnished a man to assist Carney. The latter sold 1,230 of these barrels to James H. Kelly, now deceased, and the proof tends to show that Kelly had in some manner settled with Carney for these barrels, and that the latter omitted to pay over the avails to his principals, the plaintiffs.

On December 28, 1896, the plaintiffs wrote to Kelly requesting payment of " our account, $324.41."

Mr. Kelly replied under date of December 30, 1896 : " Yours of the 28th to hand. We bought from and settled with Mr. Carney for all the apple barrels we used this season."

The plaintiffs did not again write to Kelly, and during his lifetime made no attempt to enforce the claim against him. They did, however, immediately turn their attention to their agent, Carney. On the day following the letter of Kelly they wrote to Carney as follows :

" DEAR SIR.— We just received a letter from J. H. Kelly saying he bought from and settled with you for all the apple barrels he used this season, and we hope to receive remittance from you for his account by return mail."

In a letter under date of January 8, 1897, Carney replied to the plaintiffs' letter as follows : " If Alex did not explain all the Kelly deal I will let you know it in my next letter."

The Alex referred to was an employee of plaintiffs who had assisted Carney at Lewiston, and the letter, therefore, implies that their employee was cognizant of Kelly's adjustment with Carney, and that it was not a secret arrangement between the two.

On the day succeeding the plaintiffs wrote to Carney stating they were ignorant of any deal with Kelly and requesting information, " as we want to close this up as soon as possible."

On February twenty-eighth Carney wrote to the plaintiffs : " The difference between you and Kelly and I is that you must look to me

for your pay. I have money coming to me in March and I will settle with you the minute I get it."

The plaintiffs replied on the day following : " Note what you say regarding Kelly's account. That will be satisfactory to us. Hope you will settle up this account as soon as you receive money due you, which we trust will be soon."

On March eleventh the plaintiffs again wrote their agent : " We trust that the money you are to receive to pay up Kelly's account will soon come in, as we ought to have it now, and send it to us and any other as soon as you can."

And on April sixth they urged him to pay, and asked him to give his note " for amount due on the Kelly account." They requested that the note be made due in sixty days, and if, on its maturity, he was unable to meet it in full, they would renew it in part, and added : " This will give you time and will also help us out now."

On April twenty-third, and again May twenty-sixth, they urged him to pay, adding, however, in the latter letter, that unless he paid they would be " compelled to look to Kelly."

To summarize the situation disclosed by this correspondence, we find that the barrels were sold to Kelly, who settled with Carney, and the plaintiffs were unaware of the adjustment and requested payment from Kelly, who very promptly apprised them of the settlement with Carney. From that time they abandoned any endeavor to pursue Kelly, but devoted their energies to their agent and accepted the adjustment he had made with Kelly. If the plaintiffs sought to repudiate the authority of their agent it was incumbent upon them to act fairly with Kelly, and without delay advise him they disavowed the transaction with Carney. As Chancellor Kent says in his Commentaries (Vol. 2, *616): " When the principal is informed of what has been done he must dissent, and give notice of it in a reasonable time ; and if he does not, his assent and ratification will be presumed." They did not seek to discredit the authority of their agent. After Carney informed them they must look to him for pay, there was no disclaimer of their purpose to do so, but, on the contrary, they were swift to respond on the day succeeding the agent's letter that this course " will be satisfactory to us." Assuming that the agent exceeded his authority in the transaction

with Kelly, here is a plain ratification of it. This is not an affirmance without knowledge of the facts. They did know that Kelly had settled with their agent, and this information was not based entirely upon Kelly's letter, but was confirmed by Carney. Their declaration that this was satisfactory to them expressed their purpose to look to Carney, and that course was followed. They made their election, therefore, after understanding the situation, and that election was irrevocable. (*Andrews* v. *Ætna Life Ins. Co.*, 92 N. Y. 596.)

The fact that the plaintiffs did not advise Kelly they intended to disregard his settlement with their agent does not aid them. The duty was upon them to speak when confronted with Kelly's disclaimer of his liability to them. As is said in Mechem on Agency (§ 153): " It is a maxim of the law that he who remains silent when in conscience he ought to speak, will be debarred from speaking when in conscience he ought to remain silent, and this rule is of frequent application in determining whether or not an alleged principal has set the seal of his sanction upon a transaction assumed to have been done in his behalf."

If, however, we assume that plaintiffs did not possess full knowledge of the facts before expressing their satisfaction with the explanation of their agent, the information was available to them. If they saw fit to rely upon the knowledge they then had without making further inquiries, they cannot now be heard to question the sufficiency of their information. It is said in Ewell's Evans on Agency (p. 63): " When one individual deliberately, whether with full knowledge or without inquiry, ratifies the act or conduct of another, no question arises respecting the fact of ratification."

But Carney's letter of January eighth inferentially, at least, implies that Shaw, their employee, knew of this adjustment, and their assent to it was some time after the date of this letter. Presumptively they inquired of Shaw and obtained full information of the acts of their agent. (Whart. Ag. § 65 ; *Meehan* v. *Forrester*, 52 N. Y. 277; *Hyatt* v. *Clark*, 118 id. 563.)

When Shaw was mentioned as possessing knowledge the conclusion seems irresistible that they inquired into the circumstances before stamping Carney's conduct with their approval. They were responsible for the agency of Carney, and during this correspond-

ence he was acting as their collecting agent. The letters bristle with facts showing he was receiving money for them. They were not imputing anything discreditable to him, or even complaining of his transaction with Kelly, but they were continuing his authority to represent them. Their relations are in vindication of his conduct. Business men do not in the same breath accuse their agent of dishonesty and peculation, and still retain him in a responsible position, with authority to continue performing the precise trusts out of which the charges arose.

Later on the plaintiffs sued the son of Kelly, and upon the discontinuance of the action were advised to present their claims to the executor of Carney, and there still remains an unadjusted account between these principals and their agent. It is urged that Carney was not in charge, and possessed no authority to receive pay from Kelly. In their proposition to him, which was the basis of the agreement, they state, " you to sell the barrels and we to divide the profits equally," and he was to use the avails of the sales for the payroll. Carney was to sell the goods, pay the help, collect the accounts, and the profits were to be equally divided, and that arrangement was carried out. In its execution he possessed plenary power.

But beyond this there is not an iota of evidence indicating that Kelly knew anything of Carney's agency. So far as the record shows he bought these goods of Carney individually, and settled with him as owner. That is what his letter to plaintiffs states. " *We bought from* and settled with Mr. Carney," repudiating any suggestion of the agency of Carney, or that the plaintiffs ever had any demand against him. Of course the method of dealing or payment cannot be proved by this *ipse dixit* of either Kelly or Carney, but the letter of Kelly is significant in that it shows he quickly resented any claim against him, supplementing it by the statement that he had dealt with Carney, and this explanation was apparently acquiesced in by the plaintiffs. The goods were manufactured and the business carried on in Carney's shop. There was no sign advertising plaintiffs' interest in the business. For aught that appears Kelly was entirely ignorant of their relations, and whether he paid in money or not is of no consequence if such be the fact. It is true, as contended by the appellants' counsel, that payment is an affirma-

tive defense.  As the chief actors in the transaction are both dead, its history seems to rest mainly in correspondence, and that largely of the plaintiffs themselves.  These letters were received in evidence before plaintiffs closed their case, and as the facts appeared they showed that plaintiffs had ratified the act of their agent.

The plaintiffs have waited until both Kelly and Carney are dead, and the latter's estate probably insolvent, and then attempt to repudiate their acquiescence in the adjustment made.  They cannot thus disavow their ratification.

The judgment should be affirmed, with costs to the respondents.

ADAMS, P. J., and LAUGHLIN, J., concurred; McLENNAN and WILLIAMS, JJ., dissented.

McLENNAN, J. (dissenting):

I cannot concur in the conclusion that the nonsuit in this case was right.  The motion was granted upon the theory that it was established by the evidence that James H. Kelly, the defendant's intestate, had paid for the barrels delivered to him, to one E. H. Carney, who was the agent for the plaintiffs and was conducting the cooper or barrel business for them in the city of Lewiston.  The barrels, the value of which this action is brought to recover, were manufactured at Lewiston by the plaintiffs, in the shop of E. H. Carney, and were delivered to defendant's intestate, James H. Kelly, between July 15 and November 4, 1896, and were of the agreed value of $332.10.

On December 28, 1896, the plaintiffs wrote to James H. Kelly, defendant's intestate, as follows:

"*Dec.* 28, 1896.

"J. H. KELLY, Esq.,
                "Lewiston, N. Y.:

"DEAR SIR.— Some long time ago we wrote you regarding our account, $324.41, but never heard from you.  We must have this money at once in order to meet obligations maturing now, so please send us check by return.  Please let us hear from you by return mail.

"Yours truly,
                        "E. & F. GLOR."

In answer to that letter James H. Kelly sent the following letter:

"OFFICE OF J. H. KELLY, DEALER IN GRAIN, SEEDS, FLOUR AND
  "FEED, HARD AND SOFT COAL, FARMING IMPLEMENTS, &C.
                              "LEWISTON, N. Y., *Dec.* 30, 1896.
"E. and F. GLOR,
          "Buffalo, N. Y.:

"GENTLEMEN.— Yours of the 28th to hand. We bought from
and settled with Mr. Carney for all the apple barrels we used this
season.
                              "Yours truly,
                                   "J. H. KELLY."

This is the only letter or statement made by James H. Kelly in
his lifetime, so far as is disclosed by the evidence, which, it is claimed
in any manner, indicates that he had settled or paid for the barrels.
He died on July 22, 1897, and the defendant James W. H. Kelly
was appointed administrator of the estate.

On December 31, 1896, the plaintiffs wrote to their agent, Car-
ney, as follows:
                              "BUFFALO, N. Y., *Dec.* 31, 1896.
"E. H. CARNEY, Esq.,
          "Lewiston, N. Y.:

"DEAR SIR.— We just received a letter from J. H. Kelly, say-
ing he bought from and settled with you for all the apple bar-
rels he used this season, and we hope to receive remittance from you
for his account by return mail.    *    *    *
                              "Yours truly,
                                   "E. & F. GLOR."

On February 28, 1897, Carney wrote to the plaintiffs in answer
to the letter of December 31, 1896, as follows:

"*    *    * The difference between you and Kelly and I is that
you must look to me for your pay. I have money coming to me in
March, and I will settle with you the minute I get it.    *    *    *"

In answer to that letter the plaintiffs wrote to Carney under date
of March 1, 1897, as follows:

"*    *    * Note what you say regarding Kelly's account. That
will be satisfactory to us. Hope you will settle up this account as
soon as you receive money due you, which, we trust, will be
soon.    *    *    *"

Thereafter, and upon several occasions before Carney's death, which occurred before the commencement of this action, the plaintiffs demanded payment of Carney of Kelly's account. The letters above referred to contain all the evidence upon which the defense of payment in this action is or can be based, and it may be summarized as follows: James H. Kelly, the purchaser of the barrels, stated to the plaintiffs that he had settled with E. H. Carney, their agent, for the barrels which he had purchased. That statement was communicated by the plaintiffs to their agent, Carney. He admitted that it was true, and told the plaintiffs that he would remit the money for the barrels within a month. The plaintiffs made reply to their agent, Carney, that that would be satisfactory to them. The money was not paid by their agent as he agreed, and they repeatedly asked that he should make good his promise to pay Kelly's debt. This he never did, and the action was brought.

An examination of the correspondence shows that Kelly did not say he had paid plaintiffs' agent for the barrels; he simply stated that he had *settled with Carney.* The plaintiffs did not say to their agent, " we are informed by Kelly that he *paid* you for the barrels; " but " we are informed that he (Kelly) *settled* with you for the barrels." Carney nowhere states that Kelly had paid him for the barrels, but states that he and Kelly had made a settlement, the terms of which are not disclosed by the evidence.

The plaintiffs were undoubtedly willing that Carney should carry out the terms of the settlement with Kelly, if it should result in the payment of their claim. Their only desire was to obtain their money for the barrels, and when Carney wrote them that he had made a settlement with Kelly (without disclosing its nature) and that he would send the remittance for the barrels within a month, the plaintiffs said that would be satisfactory, and there could be no reason why it would not be. It was entirely immaterial to the plaintiffs who paid for the barrels, whether it was Kelly or Carney. Carney did not do as he agreed, and the plaintiffs repeatedly reminded him of his promise and urged him to fulfill it, which he failed to do.

To establish the defense of payment the burden of proof was upon the defendant, and we think he wholly failed to make sufficient proof to meet that burden. It undoubtedly is sufficient to

establish payment or an adjustment of the account as between Kelly and Carney, but we fail to discover how such an adjustment could bind the plaintiffs. It might have such an effect if Kelly did not know before the alleged settlement that the barrels belonged to the plaintiffs, and that Carney was acting as their agent in selling them, but such knowledge is clearly shown by the evidence of Mr. Shaw, who was running the shop for the plaintiffs, and who was called as a witness by them. He says that he saw J. H. Kelly nearly every day when the barrels were being manufactured and delivered; that during that time he ordered some coal from J. H. Kelly, who was dealing in that commodity, and he says the bill for the coal was made out to the plaintiffs, E. & F. Glor; that it was credited to Kelly upon the books of the plaintiffs, and is the item of credit of seven dollars and sixty-nine cents which appears upon the bill of items. It also appears by the evidence of this witness that Mr. James W. H. Kelly, who was the agent of his father, James H. Kelly, knew the relation which Carney sustained to the plaintiffs; and we think, upon the evidence, the jury would have been justified in finding his knowledge was the knowledge of his father, James H. Kelly.

The evidence at least was sufficient to warrant the jury in finding that J. H. Kelly knew that the barrels which he purchased belonged to the plaintiffs, and that Carney in selling to him was acting as their agent. That being so, the fact that J. H. Kelly had made a settlement with Carney by which, as between themselves, Carney agreed to pay for the barrels, in no way satisfied the claim of the plaintiffs against Kelly. Kelly, as appears, was a dealer in grain, seeds, flour and feed, hard and soft coal, farming implements, etc. If Carney had purchased any of those articles amounting in value to the price of the barrels, for his own use, to the knowledge of Kelly, and had turned out the barrels in payment therefor, and agreed to make payment to the plaintiffs, the statement contained in the letter of Kelly to the plaintiffs would have been true; the statement contained in the letter of the plaintiffs' agent, Carney, would have been true, and yet it would not be claimed that such a transaction would have discharged Kelly's obligation to the plaintiffs.

If J. H. Kelly had held a promissory note of Carney for $332.10, and Carney had delivered to him the barrels in question in payment thereof, the statement contained in Kelly's letter and in Carney's letters, to wit, that Kelly had settled with Carney for the barrels, would all have been true, but such transaction would not satisfy the claim of the plaintiffs against Kelly.

There is no evidence tending to show that the plaintiffs, with knowledge of the nature of the settlement that was made, or of the exact transaction between Kelly and Carney, accepted Carney as payor instead of Kelly. The only information the plaintiffs had was that a settlement had been made, and that information was accompanied by the statement on the part of Carney that he would pay for the barrels within a month, which the plaintiffs declared in their letter would be satisfactory. Carney did not pay within a month; did not pay after repeated demands, and then this action was brought to collect from the purchaser, James H. Kelly, the purchase price of the barrels. If the evidence showed that J. H. Kelly had paid for the barrels, it would end this action. If the evidence showed that with knowledge of the nature of the settlement the plaintiffs had accepted Carney as payor in the place of J. H. Kelly, the plaintiffs would not be entitled to recover, but the evidence totally fails to establish either of those propositions. At the most it only tends to prove that some sort of settlement had been made between Kelly and Carney, by which, as between themselves, Carney agreed to pay the plaintiffs for the barrels, the nature or character of which settlement never came to the knowledge of the plaintiffs. Such a transaction, under the circumstances, did not discharge James H. Kelly's obligation to the plaintiffs.

We think the judgment should be reversed and a new trial ordered, with costs to the appellant to abide event.

WILLIAMS, J. (dissenting):

I cannot concur in the affirmance of the judgment in this case.

The trial court, in granting the motion for a nonsuit, entirely misapprehended and misrepresented the evidence in the case. I quote: "In that correspondence it appears distinctly that Kelly had paid for these barrels and paid it to Carney. There is no dispute about that at all. The letters show it plainly, and Carney says to him: 'You

must look to me for that; *I have got this money.* \* \* \* It was a good payment, so far as Kelly was concerned, and *the money went into the hands of Glor's agent,* and that ended the claim against Kelly.' "

It did not appear in the correspondence or in any way that Kelly ever paid for these barrels to Carney. Carney did not say that *he had got the money.* There was absolutely no evidence that the money for the barrels *went into the hands of the plaintiffs' agent,* Carney.

Upon this statement, as to payment, which had not the least particle of evidence to support it, the nonsuit was granted.

In fairness to the plaintiffs, the judgment based upon a nonsuit so granted should be reversed and a new trial ordered.

There is no attempt in the prevailing opinion of this court to justify the nonsuit, upon the ground stated by the trial court, but upon grounds equally untenable, and by nearly as great a misstatement of the evidence. It is said the proof tends to show that Kelly in some manner settled with Carney, and that Carney omitted to pay over the avails to the plaintiffs.

There was no evidence whatever that any such settlement was made. Kelly wrote plaintiffs that he had settled with Carney, and Carney wrote about the deal, by which plaintiffs were to look to Carney for their pay, but this was no proof that any settlement in fact was made, or that Carney received any money or valuable thing from Kelly on account of the barrels.

It is said that the plaintiffs ratified the act of Carney in making the settlement with Kelly by assenting thereto, and that they are estopped from denying that the account was so settled.

These claims are made upon the theory that, Kelly having relied upon such assent and ratification, to his own disadvantage, the plaintiffs should not thereafter be permitted to withdraw such assent and ratification, but the assent and ratification were made upon the statement by Kelly that he had settled with Carney, and it was not proved on the trial that such statement was true. It was not proved that there ever was any settlement to ratify, or that Kelly ever parted with any money or valuable thing in reliance upon such assent or ratification. The representation made by Carney to the plaintiffs in his letter of February 28, 1897, was: " The difference

between you and Kelly and I is that you must look to me for your pay. I have money coming to me in March, and I will settle with you the minute I get it." The reply by plaintiffs in their letter of March 1, 1897, was: "Note what you say regarding Kelly's account. That will be satisfactory to us." That is, their looking to him, and his paying account in March. It was the whole thing that was satisfactory to plaintiffs, not alone the looking to him, unless he paid the account soon.

The plaintiffs did not seek to take advantage of Carney being their agent, and having no right to receive plaintiffs' money from Kelly. If he ever received money or any valuable thing in payment of the account, the plaintiffs would have to be content, but there was absolutely no evidence in the case that there was any money or valuable thing parted with by Kelly to Carney to apply on the account.

The nonsuit should not be upheld upon the ground that payment in money was proved to have been made by Kelly to Carney, nor upon any claim of ratification of a settlement between Kelly and Carney, or of an estoppel, preventing plaintiffs questioning a settlement claimed to have been made.

There is no evidence upon either the theory of the trial court, or the majority of this court, to defeat a recovery by plaintiffs, and the judgment resulting from the nonsuit should be reversed and a new trial ordered, with costs to appellant to abide the event.

Judgment affirmed, with costs.

---

NOTE.— The rest of the cases of this term will be found in the next volume, 50 App. Div.—[REP.