JOHN C. RILEY, Plaintiff, *v.* JOSEPH LAROCQUE and Others, Individually and as Copartners Doing Business under the Firm Name and Style of CHOATE, LAROCQUE & MITCHELL, Defendants.

Supreme Court, Trial Term, New York County, April 21, 1937.

*Max S. Steuer* [*Max D. Steuer* and *Richard Reiss* of counsel], for the plaintiff.

*Davis, Polk, Wardwell, Gardiner & Reed* [*Theodore Kiendl* and *John M. Polk* of counsel], for the defendants other than John W. Austin.

SHIENTAG, J. A general partner in a firm of lawyers betrayed his trust. He purported to bind his firm in a series of transactions not within the scope of an ordinary law partnership. These transactions, involving substantial sums of money, were numerous and varied and extended over a period of several years. They were had with different individuals at different times and under different circumstances. Several suits have already resulted. Liability may well vary according to the facts involved in each particular transaction. It is essential, therefore, that the facts in the instant case be considered in detail.

A jury was waived before the conclusion of the trial and the customary stipulation made for the direction of a verdict.

The plaintiff, John C. Riley, seeks to recover the sum of $6,000 from Choate, Larocque & Mitchell, the defendant partnership, on two causes of action, the first on a demand note executed in the name of the partnership by one John W. Austin as a member of the firm, and the second for money due and owing in connection with the same transactions as are evidenced by the note.

Austin became associated with the defendant law firm in 1928. Up to February 1, 1932, he was employed on a salary basis, but after that date was admitted as a partner with a drawing account of $4,500 a year and a one-half interest in all fees he brought into the partnership. This arrangement continued until June 1, 1935, when he became entitled to a one-fourteenth interest in all fees earned by the firm after the deduction of expenses. As a general partner, Austin had his signature card on file with the Bank of Manhattan Company, where the general firm account was maintained, and with the New York Trust Company, which held the firm's trust account, and he was authorized to draw and sign checks upon these accounts.

Riley, for about ten years before the first transaction involved in this litigation, had been friendly with Austin, but prior to November, 1933, had no contact with the defendant firm. At that time the plaintiff's father died. Having known Austin, plaintiff went to see him in connection with his father's estate and retained the defendant firm as attorneys. The legal work connected with the administration of the estate was handled first by Austin and then by a Mr. Crawford, an attorney in the employ of the firm.

In due time the affairs of the estate were wound up. Plaintiff went to the office of the defendant on August 21, 1934, and there saw Mr. Crawford. He received a bill in the sum of $323.95, representing the charges of the defendant firm for its services. This was paid by the plaintiff, and at the same time, as administrator, he drew a check to his own order in the sum of $1,972.45, representing his share of the estate. While these matters were being attended to, Austin came into Crawford's room, invited the plaintiff into his own office, and then said, in substance: "You're coming into this money from your father's estate; and why don't you leave it here in the firm? We have many ways of investing money and you will share in the profits on a percentage proportionate to your investment." In response to this suggestion, plaintiff said he would give Austin a check in a few days. Nothing was said then, or subsequently, to indicate in any way the nature of the alleged investment or what the plaintiff's proportionate share would be, nor did the plaintiff ever make any inquiry concerning this.

On August 30, 1934, there took place the first of the transactions which are the basis of this litigation. On that day plaintiff went to the Union Dime Savings Bank and withdrew the sum of $3,000, for which he received a check of the savings bank drawn on the Chase National Bank and payable to the order of John W. Austin. This check was delivered to Austin, who in turn gave plaintiff a non-interest-bearing note for $3,000, payable·on demand, dated August 30, 1934, and signed " Choate, Larocque & Mitchell, per John W. Austin, partner."

Thereafter, not in the presence of plaintiff, Austin indorsed this check to the firm's order and handed it to one Fitzpatrick, the firm's cashier and bookkeeper, with instructions that it be deposited in the firm account to his, Austin's, credit, and that a firm check to Austin's order be drawn against it. This was done and Austin then and there received and signed the firm check given in exchange, deposited it in his own personal bank account, and appropriated the proceeds to his own use. The following entry was made on the deposit side of defendants' check book: " August 30, J. W. Austin, Chase Bank — Ch. $3,000." The amount is shown in the column entitled " Clients " as distinguished from the column entitled " General." The entries in the clients' column covered payments made by clients pursuant to bills rendered, checks credited to particular clients' accounts, and checks credited to the account of individual partners. The entries in the general column were items of income of a general firm nature. The check book also shows that $3,000 was withdrawn by check

to the order of John W. Austin on August 30, 1934, in exchange for the savings bank check for the same amount. From these original entries in the check book there were posted in the firm ledger in an account headed "John W. Austin" (1) a credit August 30, 1934, Chase Bank check, $3,000; (2) a debit August 30, 1934, check No. 18263, $3,000.

Thereafter and on or about November 14, 1934, plaintiff saw Austin again and the latter said to him that "they" (meaning the defendant firm) were going into another deal and if he had any extra money plaintiff should bring it in and let the firm invest it. On November 16, 1934, plaintiff gave Austin in cash an additional $2,000. This sum was never received by the firm, never was deposited in the firm account, and no entries thereof were made in the firm's books. To make up this $2,000, plaintiff had procured a check from Hornblower & Weeks in the sum of $1,815.37, and on the same day withdrew from the Seamen's Bank for Savings $184.63. The Hornblower & Weeks check was not indorsed to Austin or to the defendant firm, but was cashed by the plaintiff and the proceeds given to Austin. Plaintiff returned to Austin the $3,000 firm note, which was destroyed, and Austin wrote out and gave to plaintiff a new note for $5,000 in the same form and signed in the same manner as the first.

Subsequently, on September 3, 1935, plaintiff delivered another $1,000 to Austin — $148.65 in cash and the balance of $851.35 by check of Hornblower & Weeks to the order of the plaintiff, indorsed by him in blank and then indorsed by Austin and deposited in his own personal bank account. No entry was made of this $1,000 in the firm books, nor was it received by the firm. On this occasion the $5,000 note was surrendered and destroyed and Austin prepared and delivered to the plaintiff a new note for $6,000, payable on demand, signed by Choate, Larocque & Mitchell, per John W. Austin, partner. This note is the subject of the first cause of action.

During the period covered by the three transactions had by plaintiff with Austin, namely, between August, 1934, and September 3, 1935, and up to May 6, 1936, when his fraudulent conduct was discovered, Austin paid to Riley as alleged profits a total sum of approximately $1,700. Of this sum $1,577.82 was paid, at different times, by checks for varying amounts, drawn by Austin on his own personal bank account to the order of the plaintiff or to cash, and all indorsed by the plaintiff, and the balance of about $125 in cash, of which plaintiff kept no record. On one occasion, in the early part of 1936, plaintiff called to see Austin and the latter went through the form of a pretended conversation over

the telephone with Fitzpatrick, the cashier, in which he purported to inquire how much was due the plaintiff on his investment, and thereupon gave the plaintiff not a firm check but Austin's individual check for a certain amount. No questions were asked by the plaintiff nor any information given to him as to how the amounts that he received from Austin were computed, what alleged investments they covered or why Austin gave plaintiff his personal checks or cash as his share of the investments purportedly made by the defendant firm.

Austin had many other transactions with individuals other than the plaintiff. Up to August 30, 1934, the date of the first of the plaintiff's transactions, the personal account of Austin in the firm ledger showed deposits and withdrawals in three widely-separated transactions, one in 1933 and two in 1934, involving a total of $10,000. Austin's account showed that on the date of deposit or within two days thereafter these sums had been checked out by firm checks drawn to the order of Austin and deposited by him in his personal bank account. Thereafter, to the date of the second of the plaintiff's transactions on November 16, 1934, such deposits and withdrawals totaled $10,500, reflected in three items; and thereafter to the date of the plaintiff's third transaction on September 5, 1935, such deposits and withdrawals totaled about $204,000, reflected in approximately forty-two items. After September 3, 1935, the deposits and withdrawals shown in the Austin personal account totaled about $425,000.

The items just referred to represented checks drawn by various persons to the order either of John W. Austin or of Choate, Larocque & Mitchell, delivered by Austin to the cashier, Fitzpatrick, with instructions that they be credited to his, Austin's account. They were indorsed in the firm name and deposited in the regular account of the firm in the Bank of Manhattan Company. As each check was so deposited, Austin, for the most part on the same day, or at times within a few days thereafter, received a firm check for the corresponding amount, which he deposited in his own personal account and the proceeds of which he appropriated to his own use. The firm did not receive a dollar of any of these moneys. In not a single instance was there any investment made by the firm, nor did the books show any such purported investment. The entries with respect to these transactions were substantially the same as those made in connection with the $3,000 transaction of August 30, 1934, with the plaintiff, to which reference has already been made. Most of the firm's checks accomplishing the exchange were signed by Austin; in a few instances they were signed by other members of the firm.

In addition to the transactions in the regular account, there were a number of instances where funds received by Austin from persons other than the plaintiff were deposited in the firm's special or trust account and withdrawn by him. Prior to the first transaction with the plaintiff, there were four such deposits and withdrawals in the trust account aggregating $25,500. In June and July, 1935, there were two such deposits and withdrawals aggregating $30,000. The checks deposited in these trust accounts were drawn either to the order of Austin or to the firm. In one instance, June, 1935, a check for $20,000 was drawn to the order of the firm with the notation thereon " Credit the account of John W. Austin."

At times, in the absence of the cashier, entries were made in the check book by one or more members of the firm directly below or on the same pages as the entries in the transactions in which Austin was involved. The members of the firm denied having any knowledge of the entries affecting Austin. In fact, they had no actual knowledge thereof. Whether and to what extent they are bound to have knowledge of the entries in their books and whether liability may be predicated thereon under the circumstances of this case, will be reserved for later consideration.

Fitzpatrick, the cashier, testified that he at no time made any specific inquiry of Austin concerning the deposits and withdrawals to which reference has been made because Austin was a partner and it was not Fitzpatrick's duty to question the acts of a partner. There did come a time, however, in the summer of 1935, when Austin, apparently on his own initiative and in purported explanation of the many transactions, told Fitzpatrick " that he [Austin] was acting as * * * the manager for a syndicate to purchase oil options for those persons and sell." This information was not conveyed to any of the other members of the firm. In April, 1936, Fitzpatrick became suspicious and he spoke to Clarence V. S. Mitchell, one of the partners. Mitchell asked Fitzpatrick if Austin was taking out more money than he put in. When notified that the withdrawals did not exceed deposits, Mitchell did nothing further about it. Austin's fraudulent conduct was discovered early in May, 1936, at which time his resignation from the firm was demanded and received. Subsequently he resigned from the bar.

The defendants testified that they had no knowledge of any wrong doing on the part of Austin. The firm had weekly meetings at which statements were discussed showing the condition of the firm's bank account and its securities, but there was nothing in those statements to show any irregularity on Austin's part.

Let it be stated emphatically there is not a scintilla of evidence in this case that the defendant law firm was in any way a party to the fraud perpetrated by Austin, or that it benefited thereby to the extent of a single dollar. It remains to be determined whether despite this the firm may be held liable in whole or in part for plaintiff's losses.

The first question to be determined is whether plaintiff intended to deal with the partnership or with Austin as an individual. If these were personal loans to Austin, if the plaintiff looked to Austin individually and not to the firm, there is no basis for holding the latter liable. This issue is one of fact, which I resolve in the plaintiff's favor. (Cf. *Brophy* v. *Larocque*, 250 App. Div. 577.) That Riley believed he was dealing with the firm, that he intended so to do, hardly admits of doubt. It does not follow, however, from this alone that liability may be imposed upon the firm.

Austin clearly had no actual authority to bind the firm by the issuance of a promissory note. Such authority will not be implied in the case of a non-trading partnership. The members of a firm of lawyers are not to be treated as partners in trade. There is nothing shown here to take the case out of its general rule. (*National Union Bank* v. *Landon*, 66 Barb. 189; *Hunt* v. *Chopin*, 6 Lans. 139; *Harris* v. *Mayor*, 73 Md. 22; 20 A. 111; *Higgins* v. *Beauchamp*, L. R. [1914] 3 K. B. 1192; *Worster* v. *Forbush*, 171 Mass. 423; 50 N. E. 936.) Austin had no authority, actual, implied or apparent, to bind the firm to the note, nor was there any ratification of such unauthorized act on his part. The first cause of action for $6,000 on the promissory note must, therefore, be dismissed on the merits. The note, however, may be treated as evidence of the transactions on which it was based.

The next question presented is whether, and to what extent, the defendant firm is liable to the plaintiff for money due and owing. It is well to consider this question, in the first instance, in the light of the transactions had with Riley standing by themselves. Later there will be taken up the legal effect, so far as liability to Riley in this case is concerned, of the numerous transactions had with other parties which have already been outlined.

In dealing with the liability of the defendants for money due and owing, certain preliminary considerations should not be lost sight of. Austin had no actual authority to borrow money on behalf of his firm or to accept money for investment generally by the firm. Not alone was he unauthorized to do this, but such acts would be entirely outside the ordinary scope of the enterprise carried on by a firm of lawyers. Just as one member of a law

firm has no implied authority to bind his firm by the issuance of negotiable paper, so it is well settled that he has no implied authority to borrow money on behalf of his firm or to bind his firm by accepting money for investment generally. Such acts are not necessary for the ordinary conduct of the business of a law partnership. (*Harman* v. *Johnson*, 2 El. & Bl. 61; *Bourdillon* v. *Roche*, 27 L. J. Rep. [N. S.] Ch. 681.) The transactions had with Riley, standing alone, therefore, were clearly unauthorized; there was neither actual nor implied nor apparent authority for Austin to enter into them and there was no ratification thereof by the firm.

It is contended, however, that some of Riley's money actually went into the account of the firm and that having received his money the firm was obligated to hold it for his account, and not to pay it out to any one, even to Austin, without Riley's authorization. This claim can have no possible application to the second and third transactions with Riley because, as has been seen, not a single dollar of Riley's money involved in those two transactions was received by the firm or went through its bank accounts or was reflected in any way on its books. Those moneys, aggregating $3,000, were turned over to Austin in cash or by check, which he deposited in his own personal bank account, so that the firm's indorsement did not appear thereon.

In the first transaction, the details of which have been fully set forth in the statement of facts, the check for $3,000 was drawn by the plaintiff's savings bank to the order of Austin. It was deposited in the firm account to Austin's credit and immediately availed of by Austin, without any knowledge or possibility of knowledge, and without any notice to the firm, of any of the facts underlying the transaction. Riley's name did not appear on the check or in any book entry concerning it. The knowledge of Austin may not be imputed to the firm. When an agent commits an independent fraud for his own benefit he ceases to act as agent for his principal. The knowledge of the wrongdoer may not be imputed to his innocent principal. Such knowledge may be imputed only if the agent or partner were acting within the scope of his authority, actual, implied or apparent. (*Ingalls* v. *Morgan*, 10 N. Y. 178; *Bosak* v. *Parrish*, 252 id. 212; *Watkins Salt Co.* v. *Mulkey*, 225 Fed. 739, 746; *Credit Alliance Corp.* v. *Sheridan Theatre Co.*, 241 N. Y. 216.)

The knowledge of Fitzpatrick, the cashier, may be imputed to the firm. The firm also may be charged with knowledge of the entries appearing in their books. Fitzpatrick, however, did not know, nor do the entries of the transaction indicate, that Riley had any part of it. (*Flour City Nat. Bank* v. *Widener*, 163 N. Y.

276, 279. See, also, *Cronk* v. *Crandall,* 137 App. Div. 440.) All that Fitzpatrick knew and all that the entries showed was that a cashier's check for $3,000 had been drawn to the order of Austin. The check of the Union Dime Savings Bank to the order of Austin for $3,000 carried upon its face every indication of ownership in Austin. The delivery of a check in this form was in effect a representation that the funds were Austin's individual property and that any one dealing with him in respect to the check could safely treat the proceeds as belonging to him. Without knowledge or notice of the source of the funds, it seems clear that the firm only did what any reasonable man would have done under the circumstances, that is, permit a partner through the convenience of the firm account to avail himself of the proceeds of a check apparently belonging to him.

Acting as a mere conduit, as the firm did in this instance, or as a temporary depository, is insufficient to hold the firm. (*Dounce* v. *Parsons,* 45 N. Y. 180; *Bienenstock* v. *Ammidown,* 155 id. 47, *Seagle* v. *Barreto,* 190 App. Div. 549; affd., 231 N. Y. 586; *Timpson* v. *Allen,* 149 id. 513; *Toof, Phillips & Cirote* v. *Duncan,* 45 Miss. 48; *Standard Wagon Co.* v. *Few & Co.,* 119 Ga. 293; 46 S. E. 109.) Standing by themselves, therefore, these three transactions do not subject the firm to liability in whole or in part on the theory of money had and received or of money due and owing.

We now come to the effect of the Austin transactions with persons other than the plaintiff in this action. We are not here concerned with the liability of the defendant firm to the persons, or any of them, involved in those other transactions. Our only concern is whether they create in whole or in part a liability to the plaintiff here, when otherwise, as has been shown, none would exist. It is the plaintiff's contention that the entries in the defendants' books tended to show that the defendants knew or should have known that their partner was engaged in the practice of depositing in, and withdrawing from, their bank accounts large sums of money belonging to others, and that investigation would have disclosed the true situation and prevented Austin from dealing with and defrauding the plaintiff.

Riley had no knowledge of any of those other transactions. He did not act in reliance upon them. They are significant if and only to the extent that they indicate a holding out of Austin to act on the firm's behalf in transactions such as those had with plaintiff, or the ratification of Austin's unauthorized acts. They may be considered also to the extent, if any, that they show a violation of some duty which the defendants owed to the plaintiff.

Here again the knowledge of Austin, the wrongdoer, is not to be imputed to the firm. The knowledge of the bookkeeper and knowledge of the book entries will be so imputed. Here again it should be noted that the firm neither directly nor indirectly benefited in the slightest from any of the numerous transactions involving Austin. The other partners had no knowledge of Austin's wrongdoing. Fitzpatrick, their bookkeeper, had no such knowledge. The entries in the books as made bore no such implication. On their face, they were individual transactions only, as distinguished from firm matters. There was nothing in the entries to indicate that Austin was using the firm name to obtain money for himself. We are not here dealing with a case where an agent, though acting within the ordinary scope of the partnership business, exceeded his authority. Here Austin acted entirely outside the ordinary scope of the conduct of a law partnership. No apparent authority of Austin can be inferred from the other transactions involving him and appearing upon the defendants' books. (*Cohen* v. *Siegel, Cooper & Co., Inc.,* 172 App. Div. 21; *Churchill Grain & Seed Co. Inc.,* v. *Buchman,* 204 id. 30; Partnership Law, § 20.)

Nor are those other transactions indicative of a ratification by the firm of Austin's unauthorized dealings with the plaintiff in this case. The general rule is that there can be no ratification of an agent's unauthorized act unless the principal had full knowledge of the facts, so that it can be said that he intended to ratify it; or that having knowingly accepted the benefits of a transaction, he must be deemed to have adopted it. (*Engel* v. *Simmons,* 230 App. Div. 454; *Farmers Fund* v. *Tooker,* 207 id. 37; *Corrigan* v. *Bobbs-Merrill Co.,* 228 N. Y. 58, 68, 71; *Hallow* v. *Hallow,* 200 App. Div. 642, 645.) " If his knowledge is partial or imperfect he will not be held to have ratified the unauthorized act, and the proof of adequate knowledge of the facts should be reasonably clear and certain." (*Trustees of Easthampton* v. *Bowman,* 136 N. Y. 521, 526.)

The plaintiff contends that although the defendants may have had no actual knowledge, they had information from which they could reasonably have been expected to deduce the facts of Austin's transactions with Riley, and having such information and failing to act they may be presumed to have ratified those transactions. At the time of the first transaction with Riley, on August 30, 1934, the books showed that in Austin's account with the firm there were three transactions which Austin had with persons other than plaintiff, one in 1933 for $4,000 and two in 1934 for a total of $6,000. There is nothing to show to whose order the checks received by Austin were made out. They were temporarily

deposited in the regular account of the firm and immediately drawn against. Surely there was nothing in the nature of these transactions sufficient to arouse any suspicion of misconduct on Austin's part or to cause any inquiry to be made.

Prior to August 30, 1934, there were four deposits and withdrawals by Austin in the trust account of the firm. They aggregated $25,500. The first was a deposit of $10,000 on January 5, 1934, by a Baba Walker check to the order of Choate, Larocque & Mitchell, and the withdrawal by Austin of that amount on January 9, 1934, by check to the order of cash. On May 17, 1934, there was deposited in the trust account a King check for $6,000 and withdrawal of that amount on the same day by check to the order of Austin. It does not appear to whose order King's check was drawn. On June 9, 1934, there was deposited in the account a William C. Walker check for $1,500, withdrawn by Austin on June eleventh by check to the order of cash. It does not appear to whose order this Walker check was drawn. On July 13, 1934, there was deposited the R. E. Tyrrel check for $8,000, withdrawn July seventeenth by check to the order of John W. Austin. The Tyrrel check was drawn to the order of John W. Austin.

On the basis of these deposits and withdrawals by Austin, the plaintiff contends that Fitzpatrick, and thereby the firm, should have realized that Austin was either committing a larceny or if such withdrawals were deemed by Fitzpatrick to be lawful, that Austin could only have procured the checks which he had deposited by the use of the partnership name. I am unable to reach any such conclusion. Here was a partnership, entered into not for purposes of trade, but to carry on a profession. The partners were lawyers. They had a right to place implicit confidence and trust in their associates. What reason was there for Fitzpatrick to have suspected that Austin may have been acting dishonestly when there were other explanations for the deposits and withdrawals, equally consistent with legitimate conduct on the part of the individual partner? (Cf. *Shotwell* v. *Dixon*, 163 N. Y. 43, 52.)

The ordinary rule is that " Diligence to ascertain if an agent is exceeding his authority devolves on those who deal with him, not on his principal." (*Richmond Guano Co.* v. *E. I. Dupont De Nemours & Co.*, 284 Fed. 803, 809; *Texas Co.* v. *Quelquejeu*, 263 id. 491; *Porges* v. *United States Mortgage & Trust Co.*, 203 N. Y. 181.)

Was there a violation of some duty owed to Riley by the firm? If the defendants themselves had participated in any way in Austin's wrongdoing, if they had closed their eyes to a fraud being

perpetrated by their partner, if their conduct, whether by way of acts of commission or of omission, were such as to brand them with the mark of bad faith, the law would impose the full measure of liability upon them. Such is not the situation here presented.

Even if it be assumed that the firm knew of the deposits and withdrawals in both the regular and the trust accounts prior to the transactions Austin had with the plaintiff; even if it be assumed further that they inquired of Austin and were informed by him that these were transactions unconnected with the firm's business and conducted solely for the personal convenience of Austin or in connection with the oil syndicate Fitzpatrick testified Austin mentioned to him, it cannot be held, without more, that the situation so presented to the firm should have aroused suspicion as to the acts and conduct of the partner in whom they reposed trust and confidence. They showed that trust and confidence when as late as June, 1935, they gave him, as partner, a percentage of the profits of the firm. Knowledge of the entries in these accounts and the pursuit of reasonable inquiry would have disclosed nothing suspicious or alarming, and without any demand or notice or complaint from any of the individuals with whom Austin had these transactions the firm was warranted in believing in the complete integrity of their partner Austin. Nowhere is there any proof, prior to the discovery of the fraud, that any of these transactions were other than what they purported to be — deposits in the firm account to the individual credit of one of its partners and the prompt withdrawal by him of the same amounts, all being transactions wholly disconnected from the business of the firm. A professional partnership relation exacts no obligation to exercise constant vigilance against the possibility of one of the partners defrauding third persons, and certainly no duty to conduct an investigation to eliminate the possibilities of fraud where fraud is not suggested. To the contrary, the very creation of the partnership relation, in an association of lawyers, presupposes the existence of trust and confidence amongst the partners. Nothing that had occurred before the first transaction with Riley was calculated to arouse suspicion or even to put the defendants or their employee Fitzpatrick on inquiry with respect to the honesty of Austin's dealings. There was not even a failure to exercise ordinary diligence. Nothing that took place between the date of the first and the two subsequent transactions with Riley shows the violation of any duty which the defendant firm owed him.

While the case of *Carlisle* v. *Norris* (215 N. Y. 400, 415) involves a single transaction by an agent, the forthright language of HISCOCK, Ch. J., is here pertinent: " The defendants were not bound at this

time to treat with Brouwer as a thief; they had a right to assume that he was an honest man. They were not bound to conjure up all such doubts and suspicions, if any, as might have been suggested to the mind of a very vigilant and mistrustful person. Even negligence would not defeat their right. They were simply bound to act honestly and in good faith and in the absence of evidence which would justify a jury in convicting them of bad faith because not pursuing an inquiry into the origin of the check which was given them, recovery of its proceeds cannot be had from them on the theory now discussed."

As we look back on what has taken place, suggestions may occur concerning steps that might have been taken by the firm to prevent this or any similar fraud on the part of one of its members. " A widsom developed after an event and having it and its consequences as a source is a standard no man should be judged by." (*Costello* v. *Costello*, 209 N. Y. 252, 262.) Even to establish ordinary negligence the law demands more than mere speculation or surmise.

Judgment is accordingly directed in favor of the defendants. The defendant Austin was not served and did not appear in the action. Exception to plaintiff. Settle judgment, which shall contain a provision for twenty days' stay of execution and thirty days to make a case.