Seymour Schwartz, J.
The petition seeks a declaratory judgment pursuant to CPLR 3001 that an agreement entered into on November 29, 1972, between Emile Z. Berman and A. Harold Frost is valid and binding on the partnership in which they were senior members. This is but one branch of the partnership dissolution proceeding brought pursuant to section 68 of the Partnership Law.
The firm of Emile Z. Berman and A. Harold Frost (Berman and Frost) was one of the largest negligence law firms in the City of New York. It represented both plaintiffs and defendants, and had as its clients many insurance companies and large corporations. By common acknowledgment Emile Z. Berman, now retired, was an outstanding and widely respected trial lawyer in this city. A. Harold Frost, also an able lawyer, died on April 5, 1974. This unfortunate dispute, therefore, contains elements of sadness.
The partnership of Berman and Frost began on January 1, 1957. At its inception Berman handled the more important litigation and Frost concentrated on the administration of the firm. As the firm grew others were admitted to partnership. In the mid and late 1960’s Frost’s control of administration and office policy became more pronounced, and by the late 1960’s he became the effective source of authority in managing the day-to-day business of the firm. Berman continued to try cases and participated with Frost in policy making, but in the 1970’s illness forced him to curtail his professional activities.
An analysis of the authority exercised by Frost is helpful in understanding the issue to be determined here — the extent to which the November 29, 1972 agreement binds the partnership or the partners. Frost negotiated leases for the firm for space and office equipment. He negotiated and signed for bank loans for the firm. Other partners also signed the real estate leases and bank notes, but Frost was the leader and was recognized as "the boss”.
The partnership never had a written agreement and partners were informed of their admission into the firm by Frost after consultation with Berman. Partners were rarely in *719 formed of their percentage interest in the firm and indeed the percentages were changed from year to year by Frost unilaterally in February or March of the succeeding year when Frost determined the apportionment of profits and bonuses. Partners were not made privy to financial statements. With the exception of a meeting in the mid-1960’s to discuss an Internal Revenue Service surcharge, no partnership meetings were held. Frost hired and fired, making and unmaking partners with the same ease. Partners were not encouraged to ask for the books of account or for a financial statement. The only partner Frost confided in was Howard Lester, who in later years aided Frost in the administration of the firm. It was Frost’s belief that if partners knew the various percentage interests in the firm and the earnings of one another it would lead to jealousy, animosity and jockeying, making it more difficult for him to administer.
Partners rarely discussed one another’s position in this shifting hierarchy and none chose to assert his partnership rights to participate in decision making and gain access to financial records.
Out of this uneasy state of affairs, two contending groups formed. One consisted of Frost, Lester, Katz, Schwab and Birnbaum (the evidence is conflicting as to whether Birnbaum was a partner), and the second of Ausubel, Shackton and Feder. The latter group was more sympathetic to Berman’s position and his problems. Helfenstein, a key employee, but not a partner, was neutral but acted as an intermediary in efforts to resolve the problem which arose when Berman’s physical condition led to his diminished contributions to the firm. Frost was uninhibited in his declarations that "Berman must go” and made no secret of his feeling that Berman was a liability and should be removed from the firm. Frost discussed the matter with Lester in 1970, and discussed it with Berman in 1971. Lester discussed it with Berman around Labor Day, 1972. On November 29, 1972 an agreement providing for Berman’s retirement was executed between Berman personally and Frost, who warranted his authority to sign on behalf of the partnership. It provided that Berman would receive $50,000 a year for five years, and $15,000 a year for an additional five years, that he would be relieved of all liabilities as a partner and would give up his 21% interest in the partnership, an interest equal to Frost’s. The contract was placed in a safe deposit vault to which only Frost, Lester and *720 Berman had access. Berman retired from the firm on December 31, 1972.
Consistent with past conduct Frost did no more than hint to the partners that Berman’s interest had been bought out. It was not made clear whether Frost or the partnership had bought out Berman’s interest. Lester was privy to the negotiations, was kept informed by Frost and made recommendations. Helfenstein as a long-time friend of Berman acted as an intermediary and sought to bring the parties together. Berman was represented by his brother, Alfred Berman, a partner in the firm of Guggenheimer & Untermeyer. The contents of the agreement were only made known to the other partners shortly after Frost’s death, when a partnership meeting was held at Delmonico’s Restaurant on April 10, 1974. Until then, aside from Berman, Frost and Lester, no partner knew the specific contents of the agreement. In a stipulation at trial Lester acknowledged that he did not inform the other partners of the negotiations.
A considerable portion of testimony was devoted to whether the partners in fact knew enough of the contents of the agreement to charge them with knowledge. Because of his physical condition Berman did not testify and Frost was deceased. The testimony was conflicting and at time acrimonious, but certain facts are clear. Other than Berman, Frost and Lester, the partners did not know that the agreement was in writing (Ausubel was told by Alfred Berman that the agreement was in writing on March 13, 1974) and Frost’s often repeated remark "I’m buying Berman out” and "I’ve bought Berman out” was misleading in that the partners could believe that the buy-out was a personal agreement between Frost and Berman and not one with which the other partners had reason to concern themselves. A figure of $50,000 a year was mentioned by Frost or Helfenstein but not the $15,000 and there was no mention of the number of years the agreement was to run or the release of Berman from partnership obligations. No partnership meeting was ever called to discuss the negotiations or the effect of the agreement.
When Shackton inquired directly of Lester about the details of the agreement he was given no information and was told to see Frost instead. Helfenstein testified that as intermediary he kept the partners informed of the progress of the negotiations, at least to the extent of mentioning the $50,000 but the evidence demonstrated that the agreement was not signed *721 until after Helfenstein retired from the firm on November 22 or 29, 1972 and moved to Florida. He testified that he was sent an unsigned copy by Alfred Berman, and showed it to Shackton in Florida at Christmas, 1972, but Shackton and his wife strenuously denied this.
On March 12, 1974 Frost, then gravely ill, gave Lester instructions for the accountants to apportion Berman’s percentage. All the partners received increases except Ausubel and Shackton.
On March 13, 1974, Ausubel met with Alfred Berman and was told that there was a written agreement providing for Berman’s retirement. Ausubel responded that Alfred Berman had been tricked, that Frost had no authority to execute such an agreement on behalf of the partnership and suggested that to protect his brother he attempt to get the other partners to execute the agreement. This led Alfred Berman to write a letter to Lester expressing concern and inquiring whether there was an issue of Frost’s authority. Frost was then hospitalized and Lester’s response did no more than reiterate the validity of the agreement.
Following Frost’s death on April 5, 1974, Lester convened a meeting of the partners on April 10, 1974, at Delmonico’s Restaurant. There for the first time, or at the latest at a second partnership meeting on April 17, 1974, the agreement or its essential terms was read. Ausubel, Shackton and Feder immediately objected to the agreement, asserting lack of authority and refused to be bound. It was agreed that if possible a common position should be taken by the partners and a letter sent to Alfred Berman. Feder drafted the letter and on April 22, 1974, it was sent signed by Feder, Schwab, Katz, Shackton and Ausubel. The letter denied Frost’s authority to act on behalf of the partnership or to bind them and suggested a meeting to resolve the problem. Subsequently, Katz and Schwab, as well as Lester, took the position that the contract was authorized or ratified, and Ausubel, Shackton and Feder continued to deny Frost’s authority to bind them.
A settlement of the dispute proved impossible and in October, 1974, Lester filed a petition for the dissolution of the partnership. It is from that proceeding that the action for declaratory judgment arises.
A partnership is fiduciary in character with each partner owing the others the highest degree of fidelity, loyalty and fairness in their mutual dealings. It has been classically *722 expressed as "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior”. (Meinhard v Salmon, 249 NY 458, 464, Cardozo, J.)
A partnership of lawyers is subject to the same laws as any other partnership except as to certain unique features. For example, a law partner cannot bind the partnership by issuance of a promissory note nor can he borrow money on behalf of the partnership. Such authority will not be implied. (Riley v Larocque, 163 Misc 423, Shientag, J.)
If there is no written partnership agreement to the contrary, the partners are bound by section 20 of the Partnership Law in determining acts which bind the partnership:
"1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.
"2. An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by other partners.”
The firm of Berman and Frost had no retirement plan. Frost’s effort to provide one for Berman in exchange for his interest in the partnership was the first attempt to make such an arrangement with any partner. If valid, its effect would be extraordinary. Under the Partnership Law it would bind the estate of each partner, no matter how small his interest, to full payment of the consideration involved, a sum which could reach $325,000. (Partnership Law, § 67, subd 4; Matter of Peck, 206 NY 55; People v Knapp, 206 NY 373.) It would release Berman from all partnership liabilities incurred while he was a partner, although to release one partner from liability, all partners must give their consent. (Curtis v Monteith, 1 Hill 356.) In return, at least as to two of the partners, Ausubel and Shackton, they would receive no part of the Berman interest and so would receive no benefit from the arrangement, although burdened by its obligations. Neither they nor any partner other than Berman, Frost and Lester were permitted to participate in the negotiations to protect *723 their own interests, or to make a reasoned judgment as to whether they would choose to remain members of the firm in these circumstances. The result of the conduct of Frost and Lester, however motivated, was to avoid such open discussion and to hide the facts. The agreement was arrived at in secrecy. It was shrouded, at best, by ambiguous remarks that "Frost was buying out Berman’s interest”. When inquiry was directly made by Shackton to Lester, Lester refused to divulge his knowledge and referred him to Frost whose tight reins on the finances and affairs of the firm was sufficiently known to the partners to mean that the information could not be secured. This is confirmed by Ausubel’s meeting with Alfred Berman on March 13, 1974, when being informed by the latter of a written agreement, Ausubel replied that Alfred Berman had been tricked and that there was no authority for the agreement. And it is proved by the conduct of all the partners save Lester, when being informed for the first time of the contents of the agreement on April 10 or 17, 1974, shortly after Frost’s death, each signed the letter directed to Alfred Berman informing him that there was no authority for the agreement and that they would not ratify it.
The reply of petitioner is that Frost was voluntarily given the widest exercise of authority by the other partners, that within this ambit was the right to enter into a retirement agreement and that the dissenting partners by their knowledge and their silence ratified the agreement or should be estopped from contesting its efficacy.
In this pursuit, Frost was not "carrying on the business of the partnership in the usual way.”
Where one partner takes on the role of a "manager” or "director” his obligation to deal fairly and openly and disclose completely is heightened. It has been aptly described in the following terms: "Where one of the members acts as 'captain’ or 'manager’ of the venture the necessity for a full disclosure becomes more acute and rests more heavily on him.” (Libby v L. J. Corp., 247 F2d 78, 82.) And as stated by Cardozo, J., in Wendt v Fischer (243 NY 439, 443):
"If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance”.
Frost failed to carry out this mandate. One may in the proper circumstances ratify the act of an agent by silence. (Hamlin v Sears, 82 NY 327.) And there may be a duty to *724 speak and in such event silence will be taken as an assent. (Glor v Kelly, 49 App Div 617, affd 166 NY 589.) But in order for there to be a ratification or estoppel the partners must have more than mere suspicion or gossip that an agreement has been entered into. There must be more than a hint as to its terms. There must be detailed knowledge of its provisions so that it can be said that by their silence there was acquiescence, ratification or estoppel.
"But before a principal can be held to have ratified the unauthorized act of an assumed agent he must have full knowledge of the facts, so that it can be said that he intended to ratify the act. If his knowledge is partial or imperfect he will not be held to have ratified the unauthorized act, and the proof of adequate knowledge of the facts should be reasonably clear and certain”. (Trustees of Town of East Hampton v Bowman, 136 NY 521, 526.)
In a case in this State involving a law partnership, Justice Shientag expressed the rule as follows: "The general rule is that there can be no ratification of an agent’s unauthorized acts unless the principal had full knowledge of the facts, so that it can be said that he intended to ratify it; or that having knowingly accepted the benefits of a transaction, he must be deemed to have adopted it. (Engel v. Simmons, 230 App. Div. 454; Farmers Fund v. Tooker, 207 id. 37; Corrigan v. Bobbs-Merrill Co., 228 N.Y. 58, 68, 71; Hallow v. Hallow, 200 App. Div. 642, 645.)” (Riley v Larocque, 163 Misc 423, 434, supra.)
The Restatement of Agency 2d (§ 91, comment d) analyzes the essentials of such knowledge: "[T]he material facts include the parties, the conditions, the material representations of the agent or the third person when making the contract, and the consideration.”
Here no acquiescence, ratification or estoppel can be found for at best there was confusion as to the parties to the agreement, insufficient knowledge of the terms, lack of knowledge of the material representations of Frost and of the consideration. Indeed, as to the consideration, the partners were not unified in interest. Each believed he was entitled to a greater percentage interest in the partnership, yet apart from Frost and Lester, none was permitted to make his case at a partnership meeting or other appropriate forum. None was asked whether he was willing to undertake further obligations for which he could receive little benefit, or in the case of Ausubel and Shackton, no benefit at all.
*725 And with respect to Berman, the rule is that the primary obligation to ascertain the true authority of one purporting to act as agent rests upon him, not the principal. "The ordinary rule is that 'Diligence to ascertain if an agent is exceeding his authority devolves on those who deal with him, not on his principal.’ (Richmond Guano Co. v. E.I. DuPont De Nemours & Co., 284 Fed. 803, 809; Texas Co. v. Quelquejeu, 263 id. 491; Porges v. United States Mortgage & Trust Co., 203 N.Y. 181.)” (Riley v Larocque, supra, p 435.)
As a result, the agreement in issue is declared invalid as to the partnership, and each partner, save Frost (now the estate of Frost) who negotiated the agreement, and Lester, who participated in the negotiations, had detailed knowledge of its terms and is deemed to have ratified it. (Gansevoort v Kennedy, 30 Barbour 279.) As to Katz and Schwab and Birnbaum, none had sufficient knowledge to be charged with ratification of the agreement. Both Katz and Schwab signed the disclaiming letter addressed to Alfred Berman. Having subsequently decided to remain in partnership with Lester, they testified at trial that they would not contest the authority of Frost to enter into the agreement. They may if they choose voluntarily take such position now but they are not bound by the judgment of the court whose function here is to determine the rights and obligations of the parties following Frost’s death, when the terms of the agreement first became known.
Declaratory relief may be both legal and equitable.
"[A] court has the fullest liberty in molding its decree to the necessities of the occasion.” (First Nat. Stores v Yellowstone Shopping Center, 21 NY2d 630, 637.)
It is the judgment of this court:
(1) The agreement of November 29, 1972 is invalid except as to the estate of Frost, and Lester, against which Berman may assert a claim.
(2) Berman on December 31, 1972 and until a formal dissolution continues to remain a member of the firm of Berman and Frost with his original percentage intact, unless he decides to assert his claim to enforce the contract against the estate of Frost, and Lester.
(3) In the dissolution or in any action brought by Berman, he shall be charged with whatever sums were paid to him by the partnership pursuant to the agreement.