782 F.2d 1106
 Robert B. WHITNEY, Individually and as Partner of Urban
Recycle One Associates, A New York General Partnership and
Urban Recycle One Associates, A New York General
Partnership, Plaintiffs-Appellees, Cross-Appellants,
v.
CITIBANK, N.A., Carl Berger and Richard Timpone,
Defendants-Appellants, Cross- Appellees.
 Nos. 369, 488, Docket 84-9037, 85-7013.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 4, 1985.
Decided Jan. 23, 1986.
 
 Robert A. Wayne, Newark, N.J. (Robinson, Wayne, Levin, Riccio & LaSala, Newark, N.J., Robert Walsh, New York City, of counsel), for defendant-appellant, cross-appellee Citibank.
 Josephine L. Iselin, New York City (John C. Lankenau, Harriette K. Dorsen, Lankenau Kovner & Bickford, New York City, of counsel), for plaintiff-appellee, cross-appellant Robert Whitney.
 Before FRIENDLY, MANSFIELD and PRATT, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 Citibank, N.A. appeals from a judgment of the Southern District of New York, entered after a bench trial before Chief Judge Constance Baker Motley, awarding compensatory and punitive damages against it in this diversity action based on its inducement of and knowing participation in a breach of fiduciary duty on the part of co-defendants Carl Berger and Richard Timpone. The amended complaint also asserted claims of fraud, civil conspiracy, commercial bribery and negligent misrepresentation against Citibank, based on the same core of facts as that forming the basis of the breach of fiduciary duty claim. Having found in plaintiff's favor on the breach of fiduciary duty claim and that the defendants had acted pursuant to a common understanding between them, Judge Motley declined to consider the other claims, from which holding plaintiff cross-appeals. We affirm.
 
 
 2
 The material facts are either undisputed or embodied in findings of the district court supported by substantial record evidence. On October 20, 1977, plaintiff Robert B. Whitney, a real estate entrepreneur residing in California, formed a New York general partnership known as Urban Recycle One Associates (URO) with Carl Berger, an architect, and Richard Timpone, a carpenter, both of whom are residents of New Jersey. The purpose of the partnership was to purchase and develop for residential apartment use approximately 11 acres of land with an abandoned factory, located in Edgewater, New Jersey, and known as the Alcoa property. The three partners initially made the following capital contributions to the partnership:
 
 
 3
 (1) Whitney : $183,700, in the form of an option to purchase the property from its then owner, Tri-Terminal Corporation (Tri-Terminal), and investments made by him in a site analysis, architectural drawings, work product of legal counsel and consultants, zoning applications and a land survey.
 
 
 4
 (2) Berger : $5,000 in architectural-services.
 
 
 5
 (3) Timpone : $50,000 in the form of part ownership of the option to purchase the property from Tri-Terminal and $11,871 in legal work product.
 
 
 6
 Under the partnership agreement Whitney and Timpone committed themselves to make additional capital contributions of $11,300 and $13,128 respectively.[1] Profits and distributions of assets of the partnership other than return of capital contributions were to be allocated 40% to Whitney, 40% to Berger and 20% to Timpone. The parties' written partnership agreement (Sec. 2.01) provided that all "Major Decisions" of the partnership (which are defined[2]) should be made by a majority vote of the partners. The agreement also established the position of Manager of the Venture, whose function would be to implement those decisions and to conduct the ordinary and usual business of the partnership. Whitney was designated as Manager. By letter dated April 11, 1979, the partners agreed that each would inform the others of "matters relating to URO action pursuant to the URO partnership agreement."
 
 
 7
 In December 1977 URO's option to acquire the Alcoa property expired. In June 1978 Tri-Terminal, having defaulted on its mortgage of the property to Citibank, conveyed the property by deed in lieu of foreclosure to 700 River Road Realty, Inc. (RRR), a paper entity formed by Citibank to hold title to the property. URO then obtained a mortgage commitment in the sum of $2,065,000 from Citibank with a view to buying the property once Citibank acquired title. A limited partnership, Edgewater Associates (Edgewater), was then formed for the purpose of acquiring the Alcoa property. It consisted of URO as the sole Limited Partner with a 25% interest and Kenneth Gladstone as the General Partner. Edgewater purchased the property on October 4, 1978, from RRR for $2,090,000, $25,000 in cash and $2,065,000 by notes from Edgewater to Citibank, secured by two mortgages to Citibank. Pursuant to extensions the notes became due on April 1, 1980.
 
 
 8
 On April 1, 1980, Edgewater defaulted on the mortgage loan, which by that date had been reduced to $2 million. Citibank thereupon began foreclosure proceedings against Edgewater and URO. However, Citibank preferred to obtain from Edgewater a deed in lieu of foreclosure, which would enable the bank, upon sale of the Alcoa property to a third party, to avoid lengthy foreclosure proceedings and to pocket for itself any proceeds over the mortgage debt. Gladstone was willing to give such a deed and toward that end sought URO's written consent as a limited partner because Citibank was concerned that without URO's consent Gladstone might not be able to convey clear title. Art. X, Par. 10.2 of the Edgewater limited partnership agreement provided that, although the General Partner (Gladstone) had broad powers with respect to the management of the Edgewater partnership, including sale of Partnership property, the limited partner (URO) could object in writing to a proposed sale on the ground that it was not fair and equitable. An officer of the Pioneer Title Insurance Company testified at trial that when substantially the entire assets of a limited partnership are sold (which was the case here), the limited partner's consent is required for title insurance. Cf. N.Y. Partnership Law, Sec. 98.[3] Since the consent of URO partners to a sale of the Alcoa property in lieu of foreclosure would amount to a "Major Decision" as defined in Sec. 2.01 of the URO partnership agreement, for which a majority vote of the three partners was required, each partner was entitled, after being informed of the essential facts, to cast his vote on the question of whether the URO consent should be given.
 
 
 9
 Whitney, still the manager of URO in June 1980, believed that its residual 25% interest in the Alcoa property after satisfaction of the mortgage debt was worth as much as $900,000. However, rather than refuse to give URO's consent, a course which would probably have led to a foreclosure sale, he was agreeable to a sale by Citibank in lieu of foreclosure provided he could obtain from Citibank a commitment that would enable him to refinance the $2 million debt to it or, in the event of a sale in lieu of foreclosure to a third party, to share in the proceeds over and above the $2 million debt. Accordingly, he and his URO partner Berger negotiated with Randall G. Frisk, Vice-President in Citibank's Real Estate Industries Division, for such a "proceeds-sharing" arrangement.
 
 
 10
 In August 1980 Frisk told Whitney that Citibank was unwilling to provide URO with a written agreement for such a "proceeds-sharing" agreement during the pendency of the foreclosure proceedings but that the bank would offer the property for sale at $5 million in lieu of foreclosure, which Frisk characterized as a "cheap" price, and distribute to Edgewater any proceeds in excess of the mortgage debt.[4] Relying on this oral representation Whitney had URO's attorney, Donald G. Glascoff of Cadwalader, Wickersham and Taft, prepare a URO consent, which Whitney executed, and turned over to Edgewater's counsel to be held in escrow pending receipt of consents from URO partners Berger and Timpone. However, Berger and Timpone were unwilling to rely on Frisk's oral word and wanted either prompt payment by the bank to URO of an agreed sum or a written commitment from Citibank before turning over URO's consent. The consent signed by Whitney was then retrieved from Edgewater's counsel by URO's lawyer Glascoff. Gladstone of Edgewater then threatened suit against URO because of its refusal to give a deed in lieu of foreclosure, which he wanted in order to avoid having Edgewater's record include a foreclosure based on its failure to pay its debt to Citibank.
 
 
 11
 In view of the disagreement that thus developed between Whitney and his two URO partners regarding the best method of dealing with Gladstone and Citibank, Whitney on September 9, 1980, resigned as URO Manager. That role then passed to Berger. In his resignation letter Whitney advised Berger and Timpone, among other things, "the two of you are on your own." As his letter made clear, however, this statement referred to preparation of "a defense to Gladstone's court action," not to the management of URO's business generally, as Whitney emphasized in a September 16, 1980, letter to them stating, "I am also holding you responsible for upholding the URO partnership agreement with respect to my rights." On October 7, 1980, Edgewater and Gladstone brought suit in the Supreme Court, New York County, against URO, Berger, Timpone and Whitney, claiming that URO's refusal to give its consent to a deed in lieu of foreclosure violated the terms of the Edgewater limited partnership agreement and that the defendants owed $72,895 to Edgewater as an additional capital contribution. The plaintiffs sought specific performance and compensatory and punitive damages.
 
 
 12
 In the meantime Whitney sought either refinancing of the Alcoa property project with the aid of third parties or a "proceeds-sharing" arrangement with Citibank. In doing so Whitney believed that if he should succeed in these negotiations a suitable arrangement would be worked out with Berger and Timpone pursuant to their URO partnership agreement or a mutual modification of it. In a letter to Berger and Timpone dated October 28, 1980, Whitney suggested alternative plans for operating URO in a way that would promote the Alcoa property to the profit of the three partners.
 
 
 13
 Within a few weeks after Whitney's resignation as Manager of URO, Frisk, who was aware of the schism between Whitney and his URO partners, initiated negotiations with Berger and Timpone for their individual consents. As a result, on September 30, 1980, they executed such consents, which were drafted by the bank and placed in escrow with Berger's attorney, Floyd W. Tomkins, pending the conclusion of a satisfactory agreement between the two partners and Citibank. On November 7, 1980, Frisk then had Citibank's attorney, John Gutheil, draft and deliver to Tomkins, the negotiator for Berger and Timpone, an agreement whereby the latter, in return for their consents, would receive 50% of all proceeds over $2.5 million up to $3.5 million realized from the sale of the Alcoa property and 25% of all proceeds received in excess of $3.5 million. Berger and Timpone executed the agreement, which was returned on December 8, 1980, to Citibank for execution. Neither the executed consents nor the draft agreement with Citibank made any mention of Whitney's rights individually or as a partner of URO. The agreement did not mention URO's consent, but referred only to the consents of Berger and Timpone. The consents themselves were signed "individually, and as a partner of [URO]." On November 21, 1980, Citibank obtained a final foreclosure judgment against Edgewater in the sum of $2,264,994.21 with interest, counsel fees and costs.
 
 
 14
 While negotiating with Berger and Timpone for their consents, Citibank, through Michael Palin as broker, simultaneously negotiated an agreement with one of its substantial customers, Olympia and York (O & Y), for sale of the Alcoa property to American Landmarks Associates (ALA), an enterprise owned by O & Y and a real estate investor, for $3.5 million, a price substantially below its market value. Citibank's records show that in November 1980 Citibank considered an asking price of $5 million to be reasonable. The property was later appraised in December 1981 as worth $5,784,000.
 
 
 15
 Under the arrangement negotiated with Berger and Timpone in November 1980 Citibank, upon consummation of sale of the Alcoa property to ALA for $3.5 million, would owe them $500,000 for their consents. However, in January 1981, Citibank, knowing that Berger and Timpone were unaware of its proposed agreement with ALA for the sale of the property, revised its "proceeds-sharing" offer to a new proposal drafted by Gutheil (Citibank's lawyer) offering them $200,000 for their consents and that of URO, payable within 90 days of Citibank's execution of a contract for sale of the property. Berger and Timpone accepted the new terms. There was no mention of Whitney in the agreement, which was executed by RRR (Citibank's title holder), Berger and Timpone and witnessed by Tomkins, Berger's counsel, on January 13, 1981. Three days later Tomkins sent a letter to Frisk specifying how the $200,000 was to be divided among Berger, Timpone and their counsel, without any provision for payment of a share to Whitney or URO.
 
 
 16
 Despite the fact that Whitney was in frequent communication with Berger, Timpone, Frisk and Citibank's real estate broker, Palin, during the period of Citibank's negotiations with Berger and Timpone, and was keeping them advised as to his own efforts to obtain a refinancing or "proceeds of the sale" agreement, they kept Whitney in the dark as to their activities. He was completely unaware of Citibank's negotiations for the Berger, Timpone and URO consents. Laboring in the belief that Berger was unable to negotiate an agreement on behalf of URO with Citibank, Whitney authorized his attorney, Nancy W. Graham, to negotiate with Tomkins for a termination of URO. One draft of the termination agreement provided for distribution among the partners (Whitney, Berger and Timpone) of "any long term receivable [from] ... the sale ... of the Alcoa Project", with 40% to go to Whitney, 40% to Berger and 20% to Timpone. These percentages are the same as those provided in the URO partnership agreement for distribution of partnership income. In the course of approximately six months of negotiations in the first half of 1981 for a termination of the URO partnership Tomkins never mentioned to Graham or Whitney the agreement between Berger, Timpone and Citibank which he had negotiated. Tomkins later admitted in substance that his negotiations with Graham for termination of URO were a sham.
 
 
 17
 Upon learning from Palin in early 1981 that Citibank was about to sell the Alcoa property to ALA, Whitney had his attorney, Graham, inquire of Citibank's attorney, Gutheil, about URO's rights in the matter. She was falsely advised by Gutheil that the bank had all of the necessary documents for transfer of title. When she then asked to see these documents, Gutheil sent her copies of the deeds executed by Edgewater, but did not include the agreement for the purchase of URO's consent. Gutheil also referred her to Charles Eschmann, Citibank's Vice-President who had assumed Frisk's responsibilities with respect to the Alcoa property after Frisk left the bank in January 1981. On March 17, 1981, Eschmann falsely advised Whitney and Graham that Citibank was relying solely on the deed in lieu of foreclosure received from Gladstone as sufficient to convey complete title and that Citibank had no obligation to pay to URO or Whitney any part of such amount as might be received over the defaulted mortgage debt. In fact, of course, Citibank had by the January 1981 agreement agreed to pay $200,000 to Berger and Timpone for their consents and that of URO.
 
 
 18
 In late June 1981 URO's former attorney, Donald Glascoff, told Whitney that Berger and Timpone might be "side-dealing" with Citibank. Whitney promptly wrote Eschmann on June 26, 1981, asking for protection of URO's rights in the matter and payment to URO of a reasonable amount of money after satisfaction of the mortgage debt to Citibank but received no response. Whitney's letter reminded Eschmann of the verbal understanding previously reached with Frisk to the effect that URO was entitled to an equity of redemption in the Alcoa property if the proceeds from its sale should exceed the mortgage debt and that Gladstone had acted improperly in failing to assert URO's interest in market appreciation of the property and in failing to recognize that a transfer of title to the property "requires consent of all partners." When Whitney then pressed Berger, the latter admitted that he had "signed something that Floyd [Tomkins] had prepared for Richard [Timpone] and I back in the fall, a long way back" but gave no details and made no mention of the January 13, 1981, letter agreement between Citibank's title holder, RRR, Berger and Timpone, witnessed by Tomkins. On July 9, 1981, Graham on behalf of Whitney wrote Tomkins and Gutheil asking for information as to any dealings between Citibank, Berger and Timpone, with respect to the Alcoa property and asserting Whitney's demand to be included and to be given notice of any transfer of funds. Her letter to Gutheil stated:
 
 
 19
 "I understand that you are seeking the consent of the partners of URO to the transfer of the Alcoa property....
 
 
 20
 "... To avoid any implications of conspiracy or side dealing and to respect the fiduciary obligations of the URO partners one to another, it is clear that all the URO partners should be fully informed and should participate in any negotiations with respect to the issue of URO's consent to the deed in lieu of foreclosure. Therefore, I ask that you inform me, on behalf of my client, Robert B. Whitney, of the current status of any such negotiations and that you give adequate prior notice of any transfer of funds to any partner of URO."
 
 
 21
 Her letter to Tomkins further made it clear that Whitney was seeking to recover a sum due URO, not himself personally: She stated:
 
 
 22
 "The significant sum of money represented by the difference between the current selling price of the Alcoa Property and the face amount of the mortgage (commonly referred to by 'the equity of redemption') belongs in part to URO. On behalf of our client, Robert B. Whitney, we have taken steps to recover this sum for URO."
 
 
 23
 Neither Gutheil nor Tomkins replied to the letters.
 
 
 24
 During the period when Whitney was being falsely advised by Citibank and its attorney Gutheil that the bank had all the necessary documents for transfer of title and had no obligation to URO or its partners, Gutheil and Tomkins were arranging how to pay the $200,000 due Berger and Timpone for their consents and that of URO. On July 2, 1981, Citibank, in accordance with Eschmann's directions, drew four checks as follows:
 
 
 25
 Berger ................................ $112,803.68
 
 
 26
 Timpone ................................. 73,747.02
 
 
 27
 Tomkins (Berger's counsel) ............... 5,000.00
 
 Schoeman, Marsh, Updike & Welt
 
 28
 (Counsel for Berger and Timpone in
 
 
 29
 Gladstone litigation) .................. 8,449.30
 
 
 
 TOTAL ............................. $200,000.00
 The checks were delivered to Tomkins by Gutheil on July 8, 1981, to be held in escrow pending Citibank's receipt of the consents. Tomkins then forwarded to Gutheil the individual consents that had been executed by Berger and Timpone on September 30, 1980. Gutheil, however, objected to the consents on the ground that they were signed individually and not on behalf of URO, as required by their January 13, 1981, agreement with Citibank's RRR. The issue of URO's consent, as distinguished from those of Berger and Timpone, had not previously been discussed by the parties to the agreement.
 On July 20, 1981, Gutheil and Tomkins then prepared an additional form of consent on behalf of URO which they backdated to March 10, 1981, and had Berger and Timpone sign. The district court found that the backdating was done to make it appear that the URO consent had been executed before Berger and Timpone had reached a draft agreement with Whitney for termination of URO, which took place in the spring of 1981, and was to go into effect March 11, 1981. March 10th also predated Nancy Graham's assertions of Whitney's rights as a URO partner with respect to any transfer of the Alcoa property by deed in lieu of foreclosure and her demands for information as to any relevant transaction between Citibank, Berger and Tomkins.
 On July 21, 1981, Tomkins forwarded to Gutheil the original September 30, 1980, individual consents signed by Berger and Timpone and the additional backdated URO consent, also signed by them. Simultaneously the checks totalling $200,000 were released to Berger, Timpone and their attorneys. On the same day Tomkins, in response to a telephone call from Graham, told her that "Berger and Timpone had received some money from Citibank for their consents earlier that month ... [but that] he was on vacation and he didn't know anything about it." Tomkins did not disclose the amount of money received. Two days later he wrote Graham a letter advising that he no longer represented Berger, who had instructed him not to furnish further information on the matter.
 As the result of a clerical error, Citibank personnel erroneously notified Edgewater that an account in Edgewater's name had been debited with the four checks totalling $200,000 that had been drawn to Berger, Timpone and their counsel. When Edgewater, which had not opened the account and was unaware of its existence, sought information about the matter, Citibank's account officer, Michael J. O'Hanlon, who had replaced Frisk as the person handling day-to-day supervision of the Alcoa property, at first failed to respond to a series of Edgewater written inquiries and telephone calls. When Edgewater's counsel on October 21, 1981, wrote the U.S. Office of the Comptroller of the Currency asking for an investigation into Citibank's maintenance of such an unauthorized account, O'Hanlon advised Edgewater that the account had been opened to "provide the Bank with a means to pay for and maintain records with respect to all expenses incurred by Citibank, N.A. in the maintenance, upkeep and preservation of the real property known as the Alcoa Building." O'Hanlon falsely stated that "the debit was used to pay expenses relating to the property". In the meantime, in August 1981 an Edgewater accountant told Whitney of the bank checks totalling $200,000 that had been paid by Citibank. On August 27, 1981, Whitney telephoned Gutheil, Citibank's lawyer in its dealings with Berger and Timpone, and inquired about the matter. Gutheil advised Whitney that he (Gutheil) was not active in the sale to O & Y (which controlled ALA) of the Alcoa property because his partner, Paul Roberts, was representing O & Y on the ALA purchase. Although Gutheil disclosed that consents had been obtained from Berger and Timpone and that money had been paid to them, he refused to divulge the amount.
 Having thus tried unsuccessfully over a period of several months to obtain from Citibank and its counsel the facts with respect to their dealings with Berger and Timpone regarding consents to sale of the Alcoa property in lieu of foreclosure, Whitney in September 1981 commenced the present lawsuit. After a lengthy trial Judge Motley on November 13, 1984, filed a 32-page opinion detailing her findings of fact and conclusions of law. She concluded that Berger and Timpone had breached their fiduciary duty to URO and Whitney, entitling Whitney to an accounting; that Citibank had induced their breach, entitling Whitney to $236,677.25 compensatory damages and $250,000 punitive damages against Citibank, plus pre-judgment interest on the compensatory damages and costs. The compensatory damages figure represents the amount of Whitney's capital contribution to URO, an amount which Judge Motley found that Citibank would have been willing to pay to Whitney for the URO consent, in addition to the $200,000 paid to Berger and Timpone (which approximated their capital contributions), if Citibank had negotiated in good faith with Whitney rather than having induced the breach of trust by Berger and Timpone.
 The court permitted Whitney to amend the complaint to permit recovery on behalf of himself and URO. Berger and Timpone stipulated that they would return to URO the $200,000 received by them from Citibank and waive all rights to share in the recovery. In assessing punitive damages against Citibank the district court found that it was "morally culpable in that it induced Berger and Timpone to breach their fiduciary duty to URO and Whitney by giving the consent of URO without consideration to URO, without Whitney's knowledge, without following what they [sic] knew or should have known were New York Partnership Law requirements, and without regard to what they [sic] knew were the provisions of the partnership agreement." The bank was also found morally culpable in backdating the consents of Berger and Timpone and falsifying the bank's own records accordingly. The court found that the bank officers recklessly and wantonly deceived Whitney in order to gain a profit at his expense from the sale of the Alcoa property.[5] Since the district court concluded its award of damages would fully compensate Whitney for his loss it was unnecessary to rule upon other theories asserted by him as bases for his claim, i.e., commercial bribery and fraud.
 In response to Citibank's contention that the addition of URO as a plaintiff destroyed the court's diversity jurisdiction Judge Motley on April 19, 1985, filed a supplementary opinion reversing her earlier addition of URO as a plaintiff and holding that the action could be maintained by Whitney as the real party in interest since only he was entitled to damages and an accounting, URO was not a necessary or indispensible party under Fed.R.Civ.P. 19(a) (a holding that Citibank does not challenge on this appeal), the partnership had been dissolved, and all partners were parties. The district court ordered that the $200,000 relinquished by Berger and Timpone be used to satisfy the $11,177.05 due the firm of Cadwalader, Wickersham and Taft, counsel for URO, that the balance of $188,822.95 be paid to Whitney to reimburse him partially for his legal expenses, and that URO's 25% interest in Edgewater be distributed as follows: 10% each to Whitney and Berger and 5% to Timpone.
 Judge Motley granted Whitney's request to reopen the amount of punitive damages to be awarded and received additional evidence on that issue, including Citicorp's annual reports for the years 1982-1984 to establish Citibank's wealth. After examining Citibank's net worth the district court concluded that the punitive damages award must be increased to $1.5 million, an amount which the court found to be necessary and appropriate to punish Citibank for its wrongdoing and to deter repetition.
 Citibank appeals from the final judgment against it. Berger and Timpone chose not to appeal. Whitney cross-appealed from so much of the final judgment as dismissed his claims for fraud (First Claim) and commercial bribery (Second Claim).
 DISCUSSION
 Citibank does not question the well settled elements of a claim for inducing or participating in a breach of fiduciary duty. The claimant must prove (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach. As we stated in Newburger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1074 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978),
 "[O]ne who knowingly participates with a fiduciary in a breach of trust is liable to the beneficiary for any damage caused thereby. See Wechsler v. Bowman, 285 N.Y. 284, 291, 34 N.E.2d 322, modified, 286 N.Y. 582, 35 N.E.2d 930 (1941); 5 Scott on Trusts Sec. 506 (3rd Ed.1967)."
 The claim was early recognized by New York state courts. See, e.g., Anderson v. Daley, 38 A.D. 505, 511, 56 N.Y.S. 511, 515, appeal dism., 159 N.Y. 146, 53 N.E. 753 (1899). It is analogous to a cause of action for intentional interference with contractual relations, S. & S. Hotel Ventures Limited Partnership v. 777 S.H. Corp., 108 A.D.2d 351, 489 N.Y.S.2d 478 (1985); Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97, 101 (1956), or one for aiding and abetting a securities fraud, Edwards & Hanly v. Wells Fargo Securities Clearance Corp., 602 F.2d 478, 484-85 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); Schein v. Chasen, 519 F.2d 453, 460 (2d Cir.1975); see 5 Scott on Trusts, Sec. 506 at 3568 (3d ed. 1967) ("Where a person in a fiduciary relation to another violates his duty as a fiduciary, a third person who participates in the violation of duty is liable to the beneficiary.").
 Citibank concedes that Berger and Timpone as URO partners had a fiduciary duty to disclose to Whitney the terms on which URO's consent was to be given to Citibank and to account to him for proceeds received for that consent. However, it contends that the evidence was insufficient to permit a finding that it knowingly or intentionally participated in their misconduct. It emphasizes that it was entitled under Sec. 2.01(b)(3) of the URO Partnership Agreement, which requires only a majority vote of the partners to approve a major decision, to rely on the consent of Berger and Timpone. It further argues that it reasonably relied upon the authority of Berger as Managing Partner, a position he assumed in September 1980 upon Whitney's resignation. The bank points to the absence of any evidence that it was aware of the April 11, 1979 letter agreement between the partners, holding each to a duty of full disclosure to the others with respect to his actions on behalf of URO, or of Whitney's September 16, 1980, letter to his partners asking them to protect his rights under the URO Partnership Agreement. Citibank argues that, on the contrary, once the differences between Whitney and his partners regarding the Alcoa property arose in September 1980, it believed that Whitney had abandoned his partners, and was trying to promote a deal for himself with respect to the property, and accordingly wanted to terminate the partnership, leaving Berger and Timpone free to negotiate the January 13, 1981 consents on their own.
 If the evidence were limited to that relied upon by Citibank, it probably could not be held responsible for the misconduct of Berger and Timpone in breach of their fiduciary duty to Whitney. Ordinarily, absent awareness of facts indicating that a partner is acting beyond his real or apparent authority, a third party is not obligated to investigate the matter further or search for some limitation on that partner's authority. 1 Restatement (Second) of Agency Secs. 159, 161, 166 (1958). But here there was additional evidence, which is sufficient to support the district court's finding that Citibank knowingly participated in the misconduct of Berger and Timpone.
 In the first place, Citibank and its counsel knew that URO's interest in the Alcoa property was the partnership's sole remaining asset. It is questionable whether the final disposition of that asset for the sum of $200,000 amounted to "carrying on in the usual way the business of the partnership" within the meaning of Secs. 20(1) and (3) of the New York Partnership Law,[6] which delineates a partner's authority. It is more likely that transfer of URO's consent required the acquiescence of all three partners as specified by Sec. 20(3)(c) of the New York law. Indeed, the prospective dissolution of the URO partnership was known to all, including Citibank. But even construing the statute most favorably to Citibank, it is elementary that any consideration due a partnership for property owned and controlled by it (in this case, its consent) must be paid to the partnership, not to one or two of the partners. One might excuse a payment to the latter as a mistake or oversight if it appeared that the partners all appeared at peace with one another or that the payment would be endorsed over by the individual partner-payees to the partnership or shared with all other partners in proportion to their interest in the partnership. Here, however, the situation was exactly the opposite; there were red flags flying all over the place. Once Citibank was put on notice of questions concerning the authority of Berger and Timpone to bind URO without Whitney's consent, it owed a duty to reveal the facts to Whitney and determine whether his partners were authorized to act on URO's behalf in giving its consent and, if so, whether money paid to them would go to the partnership rather than to them individually. See Application of Lester, 87 Misc.2d 717, 725, 386 N.Y.S.2d 509, 514 (Sup.Ct.1976).
 The first hint that Citibank was seeking to circumvent Whitney's legitimate concern as a partner in URO was the bank's drafting for execution by Berger and Timpone only of the September 30, 1980, consents and its November 7, 1980, agreement to pay for the consents. Had the latter agreement been carried out, it would have obligated Citibank to pay Berger and Timpone individually approximately $500,000. The bank's failure to obligate itself to pay URO or (alternatively) Whitney as a joint payee, when combined with the parties' studious silence about their agreement when they contemporaneously dealt with Whitney, provided a basis for an inference that they were intentionally violating Whitney's rights as a URO partner. The probative value of these documents might at first appear to be weakened by Citibank's drafting of the January 16, 1981, agreement, which obligated Berger and Timpone to provide not only their own individual consents but that of URO. However, Tomkins' letter three days later to Frisk, specifying that the $200,000 for the consents was to be paid to Berger and Timpone individually and to their individual counsel, tends to confirm that the parties were intent on by-passing URO and Whitney.
 The events thereafter provide ample support for the district court's findings. Faced with probing by Graham (Whitney's counsel) in March 1981, John Gutheil, Citibank's counsel in the matter, sought to throw Whitney off the track by falsely stating that the bank had all of the documents necessary for transfer of title by a deed in lieu of foreclosure without any papers from URO. On March 17, 1981, Charles Eschmann, Citibank's Vice-President, joined in this falsity, adding that Citibank had no obligation to pay URO any part of the proceeds received over the mortgage debt when, as he then knew, Citibank had agreed to pay $200,000 to Berger and Timpone for consents, including that of URO. Thereafter the bank was put on clear notice by Graham's letters that Whitney was claiming a share of any funds that might be paid for the URO consent and demanding information regarding any negotiations or payment for such consents. Despite this warning and demand Citibank chose to remain silent and thus aid Berger and Timpone in breaching their fiduciary obligation to Whitney.
 The defendants' conspiracy of silence and misinformation culminated in their wrongful backdating of the URO consent and the giving of the consents on July 21, 1981, to Citibank in exchange for its payment of $200,000, partly to Berger and Timpone individually and partly to their attorneys. By that date Citibank was fully aware that the transaction violated Whitney's rights as a URO partner and that he had been deliberately kept unaware of material facts. The record thus supports Judge Motley's conclusion that Citibank had knowingly participated in the breach by Berger and Timpone of their fiduciary duties as URO partners to their partner Whitney.
 Citibank's contention that relief should be denied for the reason that Whitney was guilty of "unclean hands" or "abandonment" of the URO partnership must be rejected for the reason that this defense, which presents a factual issue, was not raised below. Terkildsen v. Waters, 481 F.2d 201, 204-05 (2d Cir.1973). Moreover, such relevant record evidence as exists indicates that the defense is meritless. Although Whitney may have been naive in relying on the verbal assurance of Citibank's Vice-President Frisk that URO would receive a share of the proceeds upon the sale of the Alcoa property (appraised at over $5 million), the record supports Whitney's contention that in trying to negotiate a "proceeds-sharing" agreement with Citibank he proceeded on the assumption that any resulting deal would have to be approved by his "group", i.e., his URO partners.
 The record evidence likewise supports the district court's finding that Whitney was damaged by the defendants' breach of their fiduciary duty to him. At the very least he was deprived of his partnership share of the $200,000 paid to Berger, Timpone and their counsel. In addition, he lost the opportunity to participate in the negotiations for the sale of the URO consent to Citibank and to use his bargaining power to force Citibank to pay a much higher price for the consent.
 Turning to the award of compensatory damages in the sum of $236,677.25, Citibank contends (with a minimum of argument) (1) that this amount is speculative and Whitney's damages should have been limited to his share of the wrongfully appropriated sum ($200,000) under the partnership agreement, and (2) that it is duplicative of the $188,822.95 awarded Whitney in his accounting action against Berger and Timpone. It was not error for Judge Motley to reject Citibank's argument that it would have paid no more than $200,000 for URO's consent in any event and that Whitney's damages should be calculated on this basis. The sum of $236,677.25 represents the amount of Whitney's total capital contribution to URO. Judge Motley reasoned that, had Whitney been apprised of the facts, Citibank would have paid at least $500,000 for the URO consent to the sale of the Alcoa property in lieu of foreclosure (since the property was appraised as worth over $5 million and ALA agreed to pay $3.5 million). Of the $500,000, Whitney's share would have been approximately $258,000. Berger and Timpone, on the other hand, would have been unwilling to share with Whitney the $200,000 they received because Whitney, based on his capital contributions and priority claim, would have been entitled to $159,958, leaving Berger $36,695 and Timpone only $3,347, far below their individual capital contributions to the partnership. Since these inferences are within the range of permissibility and the award of $236,677.25 is a fair approximation of Whitney's loss, the award must stand. When a difficulty faced in calculating damages is attributable to the defendant's misconduct, some uncertainty may be tolerated. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264-65, 66 S.Ct. 574, 579-80, 90 L.Ed. 652 (1946); Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 455-56 (2d Cir.1977); Perma Research & Development v. Singer Co., 542 F.2d 111, 115-16 (2d Cir.), cert. denied, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976).
 Citibank's claim that the award of $236,677.25 was duplicative to the extent of $188,822.95 (the amount awarded to Whitney on his accounting claim against Berger and Timpone) must likewise be rejected. Of the $200,000 the court ordered Berger and Timpone to turn over to the partnership, $11,177.05 was paid over to Whitney for URO's outstanding liability for legal services and the balance of $188,822.95 "in partial satisfaction of his legal fees in prosecuting this action and winding up the partnership's affairs." (Dist.Ct.Op., Apr. 19, 1985, pp. 18-19). Moreover, since the stipulated limit on the liability of Berger and Timpone was restricted to the accounting and did not apply to claims for which Citibank could be found to be a joint tortfeasor, N.Y. General Obligations Law, Sec. 15-108(a), does not apply.
 The district court's award of $1.5 million punitive damages presents a more troublesome problem. Under New York law, by which we are governed in this diversity suit, punitive or exemplary damages may be awarded where the defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability, making it appropriate to deter the defendants from engaging in similar conduct in the future and to induce the victim to take action against the wrongdoer. Walker v. Sheldon, 10 N.Y.2d 401, 404-05, 223 N.Y.S.2d 488, 490-91, 179 N.E.2d 497, 499-500 (1961). Proof of acts aimed at the public generally is not required, Borkowski v. Borkowski, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976). Although the need for punitive damages as a deterrent is more apparent in the case of "those who deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit" than when the conduct involves a single transaction, Walker v. Sheldon, supra, 10 N.Y.2d at 406, 223 N.Y.S.2d at 492, 179 N.E.2d at 501; see, e.g., Aldrich v. Thomson McKinnon Securities, Inc., 756 F.2d 243, 247 (2d Cir.1985), such damages have been awarded for a single act of wrongdoing. Roy Export Co. Estab. of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc., 672 F.2d 1095, 1106 (2d Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (single unauthorized broadcast of film biography after defendant had been refused copyright); LeMistral Inc. v. Columbia Broadcasting System, Inc., 61 A.D.2d 491, 495, 402 N.Y.S.2d 815, 817 (1978). The test is not the number of wrongful acts but whether the conduct is sufficiently willful and egregious to indicate a need for something more than compensatory relief.
 Just when fraud, deceit or other wrongdoing becomes so evil and so morally culpable as to call for punishment obviously is a matter of judgment based on considered observation of the defendant's conduct in light of the ordinary morals of the marketplace and on an assessment of whether the punishment is needed and will be effective as a deterrent. Deference must be paid to the district court's findings forming the basis of its conclusion that a defendant's conduct was gross, wanton or morally culpable, see Flaks v. Koegel, 504 F.2d 702 (2d Cir.1974) (award of punitive damages is within the discretion of the trier of fact). The district court's appraisal of the evidence and witnesses, as distinguished from our own, is based on personal observation of the witnesses and involves "an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." Stolberg v. Members of the Board of Trustees, 474 F.2d 485, 489 (2d Cir.1973) (quoting Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir.1970)).
 In determining the amount and effectiveness of exemplary damages to be awarded against a defendant, the court may take into consideration the defendant's wealth or net worth. Aldrich v. Thomson McKinnon Securities, Inc., supra, 756 F.2d at 248-49; Brink's v. City of New York, 546 F.Supp. 403, 413 (S.D.N.Y.1982), aff'd, 717 F.2d 700 (2d Cir.1983); W. Prosser, Handbook of the Law of Torts, Sec. 2 at 14 (4th ed. 1971). This consideration is relevant as enabling the fact finder to arrive at an award of sufficient substance to make the offender "smart", since a lesser award would probably not achieve the desired deterrent effect. Reynolds v. Pegler, 123 F.Supp. 36, 41 (S.D.N.Y.1954), aff'd, 223 F.2d 429 (2d Cir.1955). An award will be set aside only if it is "shockingly" or "grossly" excessive. Doralee Estates, Inc. v. Cities Service Oil Co., 569 F.2d 716, 722-23 (2d Cir.1977). In the world of commerce, power, size and wealth carry with them the duty of developing methods to protect against wrongdoing on the part of one's employees.
 At first blush an award of punitive damages against Citibank, a publicly-owned corporation enjoying a good reputation in commercial circles, based on the conduct of a few of its hundreds of officers, might appear incongruous. Since innocent stockholders ultimately suffer the punishment the need to deter the bank, as distinguished from the individual officers involved (one of whom in this case left Citibank's employ during the course of the wrongful conduct) is doubtful. However, the bank officers in this case (Frisk, Eschmann and O'Hanlon) were vice-presidents vested by the bank's management with considerable authority in the handling of the bank's real estate matters. Its counsel, Gutheil, who orchestrated some of the wrongdoing, was a senior partner in its real estate law firm. Their misconduct was not limited to one single act or transaction; it began in the fall of 1980 and continued for approximately one year, involving several calculated and continuous concealments and substantial misrepresentations, designed to profit the bank and its favored customer, O & Y, at Whitney's expense. Absent an exemption of publicly owned entities from punitive damages it is clear that the district court's findings of morally culpable conduct are supported by sufficient evidence, which precludes our holding them to be clearly erroneous. Under all of the circumstances, including Citibank's net worth (approximately $6.3 billion in 1984) and its annual net income (approximately $777 million), the assessment of $1.5 million punitive damages does not appear to be so unreasonable as to require that it be reduced as excessive.
 In view of our affirmance of the district court's judgment on the claim of knowing participation by Citibank in the breach of fiduciary duty by Berger and Timpone, we agree with the district court that it is unnecessary to decide whether it should have made findings and conclusions with respect to Whitney's claims of commercial bribery and fraud. There is no indication that, even if Whitney prevailed on these latter claims, which arise out of the same central core of facts as the claim for breach of fiduciary, he would recover more than the amount awarded on the latter claim.
 The judgment of the district court is affirmed.
 
 
 [1]
 It was stipulated that by December 31, 1980, Whitney had contributed $236,677.26 to URO, Berger $5,000 plus architectural services valued at $125,000 and Timpone $77,000. For his contributions in excess of $150,000 Whitney had a priority claim plus 9% interest
 
 
 [2]
 The definition of "Major Decisions" included:
 "(3) sale or other transfer (except sales or transfers pursuant to Article V), or leasing (except for certain space leases as permitted to be made without approval as specified in subsection (4) below) or mortgaging or the placing or suffering the placing of any encumbrance on the Property or the Improvements or any parts thereof;
 * * *
 "(12) the adjustment, settlement, or the compromise of any claim, obligation, debt demand, suit or judgment against the Venture, or Manager;
 * * *
 "(14) any other decision or action which by the provisions of this Agreement is required to be Approved by the Venturers or which materially affects the Venture or the assets or operations thereof."
 
 
 [3]
 A judge of the Chancery Division, Superior Court of New Jersey, in a letter opinion dated Dec. 1, 1982 (No. C-2019-81E), dismissed Whitney's claim, in the proceeding by Citibank for foreclosure of the Edgewater mortgage to RRR, that he had an interest in the property entitling him to enjoin the foreclosure. The judge stated in his opinion that "[t]he consent of URO was not needed by Citibank", and he added that "[w]hether Whitney has a right against his partners for a share of any money paid or a claim against them for breach of fiduciary duty is not before this Court." He also commented that, "Whitney's claims of impropriety, breach of contract and tortious interference with contractual and economic situations may or may not be viable against his partners, his associates or even the bank," and that "Whitney has an adequate remedy at law for any breach of contract action, tortious interference with contract action or the like, which he may be able to prove."
 
 
 [4]
 Under the Edgewater limited partnership agreement URO, as a 25% limited partner, would be entitled to 25% of the proceeds in excess of the mortgage debt paid by Citibank to Edgewater
 
 
 [5]
 The district court concluded:
 "Whitney believed that the bank was acting in good faith in dealing with him, since he had been a long time customer of the bank and had been working, with the bank's knowledge, to find a purchaser for the Alcoa Property, or to secure additional financing to rescue his own investment, or to work out a share of the proceeds of sale arrangement with the bank for URO. The bank's employees regarded Whitney as unsophisticated and naive. The bank was fully aware that there was a dispute between the partners over how the partnership should proceed in the face of the mortgage default and that Berger and Timpone were dealing for themselves, alone, and not for Whitney or the partnership. It took advantage of the strained relationship between the partners to the detriment of Whitney and the partnership. Citibank failed to disclose to Whitney that it had ongoing negotiations with ALA as well as with Berger and Timpone. The bank further deceived Whitney when it told him that the bank was relying exclusively on the general partnership consent and not on the consent given by the limited partners. Whitney had a right to share in any assets of the partnership and to be advised of any major actions taken by the managing partner, Berger, and Timpone. The bank was fully aware that Whitney was ignorant of its dealings with his two partners, Berger and Timpone, and made no effort to alert him to the fact that his partners were receiving consideration for their consents and were willing to give the partnership consent without consideration. Whitney remained in close communication with the bank officials. Under these circumstances, Citibank had an obligation to deal fairly with Whitney and to make its own records reflect the true facts."
 
 
 [6]
 Section 20 of the New York Partnership Law (McKinney's 1948) provides in pertinent part:
 "Sec. 20 Partner agent of partnership as to partnership business
 "1. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.
 "2. An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners.
 "3. Unless authorized by the other partners or unless they have abandoned the business, one or more but less than all the partners have no authority to:
 * * *
 "(c) Do any other act which would make it impossible to carry on the ordinary business of the partnership."