In re Norman STONE, Debtor.

Richard STONE, Plaintiff,

v.

Norman STONE, Defendant.

Bankruptcy No. 88 B 20195.
88 Adv. 6041

United States Bankruptcy Court,
S.D. New York.

Aug. 29, 1988.

Aronwald & Pykett, White Plains, N.Y., for plaintiff.

Barr and Faerber, Spring Valley, N.Y., for defendant.

## DECISION ON MOTION FOR SUMMARY JUDGMENT AND RELIEF FROM AUTOMATIC STAY

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The plaintiff has filed a motion for summary judgment in accordance with Bankruptcy Rule 7056 and Federal Rule of Civil Procedure 56(a), seeking a determination that obligations owed by the debtor to him, if any, are non-dischargeable pursuant to 11 U.S.C. § 523(a)(4). The plaintiff asserts that facts found by a state court are *res judicata* and collateral estoppel and, therefore, this court may make a determination

upon that court's record as to whether the debtor committed fraud, defalcation, embezzlement or larceny with regard to the plaintiff's property. The debtor asserts that the plaintiff has no standing to file this motion because it has not been adjudged that a debt is owed to the plaintiff by the debtor and no proof of claim has been filed which is *prima facie* evidence of a debt owed. The debtor argues further that the state court made no determination as to whether the debtor had committed any fraudulent or other improper actions with respect to the property at issue and therefore the bankruptcy court may not adopt the findings of the state court with regard to the plaintiff's allegations. Assuming the plaintiff obtains a determination from this court that his debt is non-dischargeable, he also seeks relief from the automatic stay in order to pursue the state court ordered accounting from the debtor while he was functioning in his capacity of a principal of several business entities. The debtor asserts that a California Bankruptcy Judge had already denied the plaintiff relief from the automatic stay; that this determination is *res judicata* as to such relief and, accordingly, argues that this court must deny the plaintiff's motion.

## FACTUAL BACKGROUND

1. In 1958 the plaintiff began to establish what eventually became a chain of retail stores selling floor coverings under the trade name Top Tile. In 1960 the plaintiff and the debtor, who are brothers, formed a company to purchase the properties where the Top Tile stores were located.

2. In 1978 the plaintiff sued the debtor and members of his family to recover the monies and property the plaintiff claims the debtor misappropriated and requested a dissolution of the partnership, appointment of a receiver and an accounting.

3. This action was tried in 1983 in the New York State Supreme Court, Westchester County, before the Honorable Lucille Polk Buell.

4. In a decision dated June 24, 1983, Justice Buell directed that an accounting be held before the Honorable Francis McCul-lough. The Appellate Division modified Justice Buell's decision by requiring the debtor to account for other partnership assets as well, and otherwise affirmed Justice Buell's decision. *Stone v. Stone*, 109 A.D.2d 834, 486 N.Y.S.2d 358. The debtor appealed to the New York State Court of Appeals which dismissed the appeal *sua sponte*.

5. Pursuant to Justice Buell's decision, the debtor attended a series of meetings with the plaintiff during which discovery was conducted in order to obtain the necessary evidence for an accounting.

6. On the day before the evidence was to be presented to Judge McCullough, the debtor flew to California. The debtor filed a petition in Bankruptcy in California four months later.

7. While this case was pending in the California Bankruptcy Court, the plaintiff brought an action for modification or relief from the automatic stay in order to proceed with the state court ordered accounting. The Bankruptcy Judge denied the motion and ordered that a trial be held in the Bankruptcy Court on the dischargeability issue.

8. Thereafter, the plaintiff made a motion to transfer the debtor's case to the Bankruptcy Court in the Southern District of New York which was granted.

## DISCUSSION

The Plaintiff in this action argues that the facts found by New York Supreme Court Justice Lucille Buell are the law of the case, *res judicata* and collateral estoppel upon which the court concluded that the debtor occupied a fiduciary relationship with the debtor. The Plaintiff contends the debtor is not entitled to a discharge of the plaintiff's debt because of the fraud, defalcation, embezzlement and larceny committed by the debtor against the plaintiff's property interests. The debtor asserts that these facts are not *res judicata* with regard to the charges of fraud, defalcation, embezzlement and larceny because Justice Buell did not expressly make such findings and, therefore, summary judgment may

not be granted because material issues of facts remain to be determined.

### Plaintiff's Standing

■ The debtor argues that the plaintiff does not have a claim upon which this court could determine dischargeability; that the plaintiff has not filed a proof of claim and, therefore, does not have standing to request a determination as to the dischargeability of his alleged claim. Pursuant to Bankruptcy Rule 4007 and 11 U.S.C. § 523(a)(4), the plaintiff has filed a complaint to determine the dischargeability of the debt owed to him by the debtor.

Bankruptcy Rule 4007(a) states,

**Persons Entitled To File Complaint.** A debtor or any creditor may file a complaint with the court to obtain a determination of the dischargeability of any debt.

11 U.S.C. 101(4) defines a "claim" as (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

All claims that fall within the definition of section 101 and that arose before the order for relief under chapter 7 whether or not a proof of claim has been filed, may be objected to as nondischargeable under section 523. 3 Collier on Bankruptcy ¶ 523.05 at 523–14. The debtor may discharge any pre-petition debt owed to a creditor. The terms "claim and "debt" are coextensive. *In re Olson,* 9 B.R. 52, 53 (Bankr.E.D.WI. 1981); S.Rep. No. 989, 95th Cong.2d Sess. 23 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5809. By the broadest possible definition, and by the use of the term throughout title 11, especially in subchapter I of chapter 5, the Code contemplates that all legal obligations of the debtor, no

matter how remote or contingent will be able to be dealt with in the bankruptcy case. *In re Olson,* 9 B.R. at 53–54; *See Grady v. A.H. Robbins,* 839 F.2d 198 (4th Cir.1988); *In re Edge,* 60 B.R. 690 (Bankr. M.D.Tenn.1986); H.R. No. 595, 95th Cong. 2d Sess. 309 (1977), U.S.Code Cong & Admin.News 1978, pp. 5787, 6266; *See also* S.Rep. No. 989, 95th Cong.2d Sess. 21–22 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5807–5808. The objection by the debtor that the plaintiff is not owed a "debt" by the debtor and additionally has no standing because the plaintiff has not filed a proof of claim is not sustainable. The debtor has listed in his Schedules filed in this case that the plaintiff has an "unknown" contingent claim against the debtor. It is axiomatic that in light of the debtor's ability to discharge the plaintiff's claim because it is contingent and unliquidated, regardless of whether a proof of claim is filed, it follows this plaintiff has standing to seek a declaration that this claim is nondischargeable.

■ It is not premature for this court to determine whether or not the plaintiff's claim is dischargeable even though the debt is unliquidated, contingent and a proof of claim has not been filed. Although, in his affidavit, the debtor claims that no monies are owed to the plaintiff and therefore a determination of dischargeability is a waste of time, Justice Buell's decision, as modified by the Appellate Division, determined that the actions on the part of the debtor, and the amount of assets which existed in the partnership before it was dissolved, indicate that monies may be due and owing to the plaintiff. Therefore, the plaintiff is entitled to an accounting to determine the extent of his claim.

If this court were to decline to decide whether or not the alleged debt owed to the Plaintiff is dischargeable until the amount of the debt were determined, the plaintiff would have to go through the efforts of an accounting with the consequent discovery of documents dating back to the early 1970's. This voluminous discovery could take months. If it is determined that the debtor must pay a fixed sum to the plain-

tiff and then this court determines such a debt is dischargeable, the plaintiff will have expended an incredible amount of time and money to a dischargeable end. The plaintiff and the debtor do not claim that any other relevant facts would be elicited from the accounting that would reflect on the dischargeability issue. Therefore, this court, on a motion for summary judgment, must determine if there are any disputed facts as to dischargeability and, if not, a motion for summary judgment as to dischargeability of the plaintiff's claim would be appropriate.

### Summary Judgment

In ruling on a motion for summary judgment the court's function is to determine whether a genuine issue as to any material fact exists, not to resolve any factual issues, *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court must deny summary judgment where there is a genuine issue as to any material fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and grant summary judgment where there is no such issue and the movant is entitled to judgment as a matter of substantive law. *Hamilton v. Smith*, 773 F.2d 461 (2d Cir.1985). The moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts which entitle him to judgment as a matter of law. *Katz v. Goodyear Tire & Rubber Company*, 737 F.2d 238, 244 (2d Cir.1984); *See* 2 J. Moore, A. Vestal, P, Kurkland, Moore's Federal Practice and Procedure § 17.10 at 17–34 (2d ed. 1987).

The plaintiff argues that Justice Buell's legal and factual conclusions are *res judicata* and that the debtor is collaterally estopped from having the issues relitigated in a determination of dischargeability. The debtor asserts that fraud and defalcation were never pleaded in the state court action and therefore these issues were not litigated, thereby rendering the state court decision nonpreclusive and requiring litigation of the applicable facts in the bankruptcy court. Therefore, the debtor argues that there are material issues of fact which

exist that must be litigated which preclude summary judgment.

■ The doctrine of *res judicata*, or claim preclusion, is distinguishable from the principle of collateral estoppel in that *res judicata* forecloses all that which might have been litigated previously by the parties, whereas collateral estoppel treats as final only those issues actually and necessarily decided in a prior suit. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). In *Brown v. Felsen*, 442 U.S. 127, 139, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979), in dealing with the principle of *res judicata*, the Supreme Court noted in footnote 10 that if a state court determined factual issues in a state law question, using standards identical to those of § 17 of the former Bankruptcy Act (now 11 U.S.C. § 523), the principle of collateral estoppel, in the absence of countervailing policy, would bar relitigation of those issues in the bankruptcy court. In *Spilman v. Harley*, 656 F.2d 224 (6th Cir.1981), the court determined that issue preclusion was not at odds with the Supreme Court's decision in *Brown v. Felsen* stating,

Applying collateral estoppel is logically consistent with the Supreme Court's decision in *Brown* and the exclusive jurisdiction of the bankruptcy court while at the same time encouraging judicial economy. The determination whether or not a certain debt is dischargeable is a legal conclusion based upon the facts in the case. The bankruptcy court has the exclusive jurisdiction based upon the facts in the case ... Therefore, res judicata does not apply to prevent litigation of every issue which might have been covered in the state court proceeding on the debt. *However, that Congress intended the bankruptcy court to determine the final result—dischargeability or not— does not require the bankruptcy court to redetermine all the underlying facts.* (Emphasis added).

*Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir.1981); *See In re Wallace*, 840 F.2d 762

(10th Cir.1988). Therefore, it was not necessary that the plaintiff plead fraud, defalcation, larceny or embezzlement in its state court complaint. Any determination by the state court of fraud or other improper actions on the part of the debtor may be adopted by this court, but ultimately it is the bankruptcy court's exclusive jurisdiction to determine the elements required for the finding of nondischargeability. *See* Ferriell, J. "The Preclusive Effect of State Court Decisions in Bankruptcy", 59 Am. Bankr.L.J. 55 (1985).

The plaintiff states that all relevant facts to dischargeability have been litigated in the state court and this court must adopt these factual findings to the determination of this issue. This court holds that it is required to adhere to the findings of fact in Justice Buell's decision in light of the fact that the issue as to the debtor's liability to the plaintiff is the same as that involved in the prior state action. The issue was actually litigated by the parties in a prior action and the state court's determination of that issue was necessary to the resulting final and valid judgment. *In re Wallace*, 840 F.2d at 765. Although the bankruptcy court, in a dischargeability action under section 523, ultimately determines whether or not a debt is dischargeable, the doctrine of collateral estoppel may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability. *In re Wallace*, 840 F.2d at 764; *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377–78 (5th Cir.1980).

Therefore, the court accepts as binding the following facts resolved in Justice Buell's decision in *Stone v. Stone*, dated June 30, 1983, which the court deems relevant to this proceeding:

1. Regardless of the existence of a corporation under which Top Tile and various other debtor entities operated, the relationship between the plaintiff and the debtor was one of a partnership under New York Law.

2. Because a partnership existed between the plaintiff and the debtor, each had a fiduciary duty to the other and were and are accountable as a fiduciary under New York Law.

3. In June of 1975 the debtor, an attorney, held the position of both President and Secretary of A. Stone and Co., Inc. which dual capacity was held to violate the New York Business Corporation Law Section 715(e). This proscribed combination gave the debtor the power to exercise control over all of the business affairs of A. Stone & Co., Inc.

4. All corporate minutes were prepared by the debtor, signed by the debtor and kept in his possession. Justice Buell stated that she considered the validity of the minutes produced by the debtor to be questionable.

5. On August 27, 1976, the debtor, the plaintiff and their parents entered into an agreement stating that the plaintiff and the debtor desire to separate their business interests in A. Stone & Co., Inc and Top Tile Building Supply Corp. Six retail stores were to be conveyed to each brother. No assets were transferred to their parents.

6. On September 15, 1976, sales agreements were executed between Top Tile Building Supply Corp. and Top Tile Poughkeepsie Corp., controlled and operated by the debtor, for the purchases of several stores controlled and operated by the plaintiff. In connection with the purchases, notes were issued to Top Tile Building Corp. by the plaintiff in the total amount of $192,888.86. Notes were issued to the debtor totalling $372,505.71. These notes were found to be assets subject to division by the August 27, 1976 agreement. The total sum of the debtor's notes exceeds the total sum of the plaintiff's notes by $178,587.35, to which the plaintiff was found entitled to receive one-half of the unpaid balance due on this amount.

7. In late September of 1976, for reasons unknown to the plaintiff, his parents requested the return of the A. Stone & Co., Inc. stock they transferred equally to the debtor and the plaintiff. The plaintiff conferred with the debtor and he advised him that the plaintiff had to return the stock pursuant to his father's right of recall on

the stock, which could be exercised at anytime. Justice Buell found that the plaintiff had never heard of any such agreement before being told this by the debtor. Nonetheless, as a result of the debtor's *legal* advice, the plaintiff returned the shares. At the state court trial, the debtor denied that he returned his shares because of any right of recall and testified that he returned them because his father had given them to him and requested them back. On November 22, 1977, the seventeen shares which the plaintiff transferred back to his father, and which bear no such legend, were transferred to Peter and Harlan, the debtor's sons, thereby giving the debtor control of the stock of A. Stone & Co., Inc. The court found that the validity of the transfer is questionable because their father's signature on the transfer was unwitnessed and because their father testified at his examination before trial that he was looking for his certificates but was unable to locate them.

8. The August 27, 1976 agreement between the debtor and the plaintiff required a division of assets of A. Stone & Co., Inc. and Top Tile Building Supply Corp. The debtor, who remained in complete control of the books, records and bank accounts of these companies, has yet to divide and distribute or account to the plaintiff pursuant to this agreement. These assets include the notes signed by the plaintiff and debtor, assets of specific stores, an outstanding lawsuit, inventory, trademarks and patents. The balance sheet of A. Stone & Co. as of December 31, 1976, shows total assets of $788,556.80, no liabilities and a capital stock and surplus of the same figure. Justice Buell held that the plaintiff is entitled to an accounting of all the assets, liabilities, affairs and transactions of A. Stone & Co., Inc. and Top Tile Building Supply Corp. from August 27, 1976 to June 30, 1983, the date of her decision.

9. In December of 1976, the plaintiff became dissatisfied with the manner in which the debtor was carrying out the division of the operation of the retail stores. He wrote to the partnership's accountant, Saul Klaw, stating he wanted an accounting consisting of a six month profit and loss statement for each store. The debtor refused to give any such accounting.

10. The plaintiff left the country to go to Taiwan to conduct business in 1976. The plaintiff and debtor still continued to conduct business as partners. The court found that the debtor retained total control over the business, and as a result of the plaintiff leaving the country, the debtor's obligation to deal fairly and honestly and to disclose partnership affairs was heightened. *See Matter of Lester,* 87 Misc.2d 717, 386 N.Y.S.2d 509 (S.Ct.N.Y.Co.1976).

11. In January 1977, the debtor called a meeting of A. Stone & Co., Inc. in the plaintiff's absence. The debtor was once again elected president and secretary and the plaintiff was elected treasurer. The plaintiff was not informed of the election nor of the position he then held. At that point the debtor informed the plaintiff, by letter, that he did not think that he, the debtor, needed to consult with the plaintiff, the plaintiff's wife or Saul Klaw, their accountant, or take action in regard to powers of attorney which existed. The debtor stated, once again, that the division of' assets was equitable. With regard to the debtor's action, Judge Buell stated, "[i]t is clear that [the debtor] did not want to account to anyone as to the assets he controlled."

12. In February as 1977, the court described the events which occurred as follows:

[The debtor] commenced what may be described as a "cat and mouse" game with [the plaintiff], alternating threats and cajolery and all the while maintaining control of the former assets of A. Stone & Co., Inc, Top Tile Building Supply Corp., Top Tile Realty Corp. and the new Taiwan ventures, using the structure of A. Stone & Co., Inc. as a means of manipulating [the plaintiff].

13. Justice Buell summarized the testimony of Saul Klaw, accountant for Top Tile Building Supply Corp., A. Stone & Co., Inc. and Top Tile Realty Corp. since 1969, as follows:

He [Saul Klaw] stated that in March 1977, he requested a financial statement concerning the purchase and sale of all retail stores from [the debtor]. He told [the debtor] that to issue a statement covering Top Tile Poughkeepsie Corp., inasmuch as the prime asset was inventory, would require some verification on his company's part as accountants. Klaw suggested taking inventory at that time and rolling back the numbers to verify the stated value as of November 1, 1976. [The debtor] would not agree to this. [The debtor] told Klaw that he had the ability or authority to place [the plaintiff] in a mental home because he felt he was mentally unbalanced at this time. As a result of this, Klaw resigned his position.

14. The dispute over the August 27, 1976 agreement continued. In May 1977, the plaintiff wrote the debtor that he wanted a split of all the A. Stone & Co., Inc assets. At that time, the debtor was in control of all of the plaintiff's assets including his current income. These assets belonged to the plaintiff as a result of the A. Stone and & Co. agreement of August 27, 1976, which included the assets of the new Taiwan venture, including contracts in the name of A. Stone & Co., Inc and those with customers. Justice Buell stated,

[The debtor] continued his refusal to account to anyone beyond his own statements that everything has been "equitable" and continued to deal in the same manner with [the plaintiffs] attorneys.

15. On August 3, 1977, the debtor wrote to the plaintiff that he decided to leave A. Stone & Co., Inc. and discontinue any further activities for the development or sale of the Taiwan project. On that very same day, he wrote to Chung Pei, a Taiwanese producer, and introduced himself as the plaintiff's brother. The debtor inquired as to whether Chung Pei could produce self-adhesive tiles. He requested that Chung Pei keep this matter confidential.

16. In September of 1977, Klaw wrote to the plaintiff stating that it had come to his attention that only the Latham and Pittsfield stored remained under Top Tile Newburgh Corp. The debtor had recommended closing all other stores. He urged the plaintiff to return to the United States to look into his affairs because the stores were "one of [the plaintiff's] prime assets".

17. Justice Buell found that the debtor continued to "apply psychological pressure upon [the plaintiff]". The debtor wrote to the plaintiff in September of 1977 that he would only communicate with the plaintiff's attorney regarding the division of the businesses. The court found that because the debtor was in complete control of all financial matters he knew that the plaintiff was in severe financial difficulty.

18. In September of 1977, the debtor moved the accounts of A. Stone & Co. Inc. He signed an agreement with Lincoln first Bank and A. Stone & Co. Inc. authorizing a checking account, loans and related matters.

19. In November 1977, the debtor put a Mr. Watanabe of Tah Shen, a Taiwanese company, in charge of the plaintiff's businesses without telling the plaintiff. This action caused great embarrassment to the plaintiff who had worked closely with Watanabe in Taiwan. The court reiterated that it was the plaintiff who cultivated all the product resources in Taiwan.

20. In January 1978, the debtor conducted a directors' and stockholders' meeting and again, the plaintiff was excluded from A. Stone & Co., Inc. as an officer or director. During that same month the plaintiff's attorney requested that the debtor draw up a proposed agreement for an equitable settlement and division of the plaintiff's assets. The debtor did not prepare such an agreement.

21. On March 28, 1978, shortly after the debtor cut off payments to the plaintiff from the Tah Shen contract, the debtor informed the plaintiff that pursuant to an agreement signed between the debtor and the plaintiff with regard to the plaintiff's right of first refusal on the sale of the Pittsfield store, he intended to sell the store if the plaintiff did not exercise his option to purchase. The debtor sent this

letter to the plaintiff's Hartsdale, New York address, knowing full well that the plaintiff was in Taiwan and would not return in time to learn of the proposed sale and exercise his option. The debtor sold the store to Top Tile Ltd, his own corporation. No accounting was ever made regarding this sale, no disclosure of the terms of the sale and no compensation was given to the plaintiff from the sale.

22. Justice Buell determined that the debtor *"again used the corporate structure of A. Stone & Co., Inc. to divert partnership assets to himself"*. The debtor refused to pay invoices sent to A. Stone & Co. by the plaintiff stating "You [the plaintiff] do nothing for A. Stone & Co. Inc."

23. In April of 1978, the debtor wrote to Watanabe of Tah Shen stating "When he [the plaintiff] was committed to the mental hospital and certified as insane, I took him out in 1975 because I thought he would get mental help from Doctors. As for A. Stone & Co., Inc., we do not wish for [the plaintiff] to be involved any longer in any decisions of our company. As president, I must thereby notify you of this fact. This has nothing to do with any dividends to him which will be fairly judged once all problems are solved" The letter also authorized Watanabe to send the plaintiff expense money. The dividends referred to in the letter had never been received by the plaintiff. As to these facts Justice Buell found as follows:

> The statement as to his commitment to a mental hospital as certifiably insane was false and malicious and *must be construed as another means by which [the debtor] took Tah Shen assets, which were partnership assets, for himself.*

Justice Buell found it particularly reprehensible that the debtor, an attorney, would use the word "committed" and then deny having any knowledge as to the meaning and connotation of this word. In fact, the plaintiff was not committed but was voluntarily admitted to High Point Psychiatric Center for a short period in 1975 after he attempted to commit suicide. The court concluded that the debtor's false represen-

tations and subterfuge achieved their purpose and by May, 1978, Watanabe would no longer deal with the plaintiff.

24. Despite the debtor's conduct towards the plaintiff, they continued to do business as partners. In 1978, the debtor and the plaintiff set up various corporations in Hong Kong. Two of these corporations were Whitegate Ltd. and Top Tile Ltd. In mid-1978, the debtor went to Hong-Kong and selected an auditor for these corporations. While there the debtor told Bhalla, a representative of Nordcorp, which serviced Top Tile Ltd., that the plaintiff was a mental case and that he was released from a mental institution on the debtor's guarantee and that *no information was to be passed to the plaintiff.*

25. In addition to their interests in A. Stone & Co., Inc. and Top Tile Building Supply Corp. the brothers had formed Top Tile Realty Corp. in 1962. On May 15, 1972 the debtor signed the first series of amendments to the certificate of incorporation. *He affixed the plaintiff's name as an officer to the amendments, but the plaintiff knew nothing of the changes until the commencement of the suit in state court.*

26. In January of 1978, the brothers entered into an agreement to sell Top Tile Realty Corp.'s Schenectady building and to divide the proceeds of the sale equally. The plaintiff received a check for $2,096.67. However, a closing statement from the sale showed that the net proceeds were $21,-015.32, less $495.00 legal fees. Justice Buell concluded:

> Before sending [the plaintiff] his share of the sale proceeds, [the debtor] deducted approximately $11,991.98 for alleged payments for other obligations. Several checks in various amounts were made out to Top Tile Poughkeepsie Corp. Not only were the alleged payments unsubstantiated, but they clearly violated the January 30, 1978 agreement. As the total proceeds were to have been evenly divided, [the plaintiff] is entitled to judgment in the sum of $8,163.49, the balance due on his share of the proceeds from the sale of the Schenectady building.

The debtor, in his affidavit, stated he had subsequently paid the plaintiff $8,163.49.

27. The court determined that based upon the facts adduced, the plaintiff is entitled to an accounting of all the entities in which both he and the debtor shared any interests. The plaintiff is also entitled an accounting as to the assets, liabilities, affairs and transactions of the debtor and any person or entity to which the debtor may have transferred the plaintiff's interest with Tah Shen Trading Co., Ltd., including the continuing transactions after the termination of the partnership, except that portion of business attributable to Han Saiem. The plaintiff is also entitled to an accounting as to the assets, liabilities, affairs and transactions of Top Tile Realty Corp. from August 27, 1976 to the date of the final disposition of the assets of Top Tile Realty Corp. The debtor must also account for the assets, liabilities and affairs and transactions of Top Tile Newburgh Corp. and Top Tile Poughkeepsie Corp., from August 1976 to date. The court further determined that the plaintiff was entitled to an accounting of the assets, liabilities, affairs and transactions of Top Tile Poughkeepsie Corp. and Top Tile Newburgh Corp. and that he is entitled to recover in full all assets of Top Tile Newburgh Corp. Additionally, Justice Buell ordered an accounting of the disposition of assets of each store that was closed and of the debtor's sales to himself of the Latham and Pittsfield stores.

### *Dischargeability*

■ The plaintiff seeks a determination by this court that his claim against the debtor as reflected in the state court decision, is nondischargeable pursuant to 11 U.S.C. § 523 which states,

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\*    \*    \*    \*    \*    \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;

Debts for fraud or defalcation while acting in a fiduciary capacity are excepted from discharge. *In re Black*, 787 F.2d 503 (10th Cir.1986); *In re Johnson*, 691 F.2d 249 (6th Cir.1982). The burden of proving that a debt falls within a statutory exception is on the party opposing discharge. *In re Black*, 787 F.2d at 505 (10th Cir.1986). A determination of when a fiduciary relationship exists pursuant to section 523(a)(4) is determined by looking to state law. *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir. 1986); *In re Interstate Agency, Inc.*, 760 F.2d 121 (6th Cir.1985). Justice Buell determined that the debtor and the plaintiff conducted their businesses as partnerships and that a fiduciary relationship and duties existed between the brothers pursuant to New York Partnership law. New York State Partnership law (NYSPL) § 43 states:

**Partner accountable as a fiduciary**

1. Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property.

NYSPL § 41 provides;

**Partnership Books**

The partnership books shall be kept, subject to any agreement between the partners, at the principle place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them.

NYSPL § 42 provides:

**Duty of partners to render information**

Partners shall render on demand true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability.

Justice Buell's factual conclusions demonstrate that the debtor repeatedly breached his fiduciary duties to the plaintiff by failing to provide access to the books of the businesses so the plaintiff could perform an accounting. The debtor also failed to satisfy NYSPL § 42 by failing, on demand,

to provide true and full information of all things affecting the partnership.

It has been conclusively determined that a fiduciary duty existed by and between the brothers and that fiduciary duty was breached by the debtor. However, the issue within the context of 11 U.S.C. § 523(a)(4) is whether this debtor's breach of fiduiary duty amounted to fraud, defalcation embezzlement or larceny. *In re Braudis*, 86 B.R. 1001, 1004 (Bankr.W.D. Mo.1988). The plaintiff need only prove one of the proscribed alternative grounds against the debtor for a determination of nondischargeability as to his debt.

The term "fraud" in the context or § 523(a) is derived from its meaning under Bankruptcy Act Section 17(a)(4). In *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1867) the Supreme Court said,

> The fraud referred to in that section means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.

Defalcation is broader than "embezzlement" and probably broader than "misappropriation". *In re Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937). Ordinarily the word defalcation implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. *In re Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d at n. 5.

This court interprets Justice Buell's findings to mean that the debtor intentionally, maliciously and deviously attempted to divert partnership assets which belonged to the plaintiff. The following actions demonstrate the fraud and defalcation by the debtor against the plaintiff: The debtor's refusal to provide an accounting which had been requested by the debtor for over two years prior to the filing of the petition in bankruptcy and his continued failure to comply with the state court ordered accounting prior to and subsequent to the filing of the bankruptcy petition; his continued false representations that the businesses had been divided "equitably", with-out providing an accounting; his threats to commit his brother as an intimidation tactic to deter requests for an accounting; the state court's determination that the debtor had intentionally deprived the plaintiff of his half of the proceeds of the sale of the Schenectady building; the debtor's false representations of the plaintiff's psychological stability and mental history to Taiwanese producers with whom the plaintiff had cultivated business relationships, so that the debtor could discredit his brother and divert the contracts to his own use; the existing disparities between the value of the debtor notes, inventory, assets and liabilities of the businesses and the notes received by the plaintiff from the so-called division of assets pursuant to the August 27, 1976 agreement; and, the debtor's false legal representation to the plaintiff that their father retained the right to recall and in fact did recall the stock of A. Stone & Co. which was given equally to the brothers, and the questionable validity of the transfer of the stock to the debtor's sons, amounting to a diversion of the plaintiff's interest in the company to the debtor.

All of the debtor's actions demonstrate an intent to keep the plaintiff in the dark about the affairs of the businesses, even going so far as to affix the plaintiff's signature fraudulently to corporate minutes in order to make amendments to the corporate charter. The state court found that the debtor misappropriated and diverted assets that rightfully belonged to the plaintiff in his capacity as a partner and to which he was entitled pursuant to the August 27, 1976 agreement calling for a division of assets between the brothers.

Accordingly, this court finds that the plaintiff's debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) because the debtor committed fraud and defalcation while acting in a fiduciary capacity. There is no reason for this court to consider the plaintiff's allegations of embezzlement and larceny considering he has demonstrated that the debtor committed fraud and defalcation while acting in a fiduciary capacity.

### Relief from the Automatic Stay

The plaintiff has filed a motion seeking relief from the automatic stay in the event

this court determines his claim is nondischargeable. The debtor argues that the plaintiff is precluded from bringing a motion for relief from the automatic stay because Bankruptcy Judge Mund, in the Central District of California, previously denied this relief. The debtor asserts that Judge Mund's decision is *res judicata,* thereby prohibiting consideration of this motion by this court. This court does not believe Judge Mund's decision is *res judicata.* That court made no determination as to the issues or law regarding the relief from the automatic stay. Her denial of relief was merely predicated upon an initial determination as to the dischargeability of the plaintiff's debt.

In light of this court's determination that the plaintiff's debt is nondischargeable, the plaintiff requests this court grant him relief from the automatic stay to obtain the state court ordered accounting. It is unnecessary for this court to determine whether the plaintiff is entiled to relief from the automatic stay. The debtor received a Chapter 7 discharge on November 3, 1987. Upon the granting of a discharge under chapter 7, the automatic stay terminates pursuant to 11 U.S.C. § 362(c)(2)(C). Because the plaintiff's debt is nondischargeable, he is not subject to the 11 U.S.C. § 524(a)(2) post-discharge injunction which operates against the commencement or continuation of an action to collect a discharged debt. The accounting should proceed expeditiously in light of the debtor's representation in his affidavit that he is more than willing to provide all the necessary documents to the plaintiff.

Even if the automatic stay were not terminated by virtue of 11 U.S.C. § 362(c)(2)(C), this case is a no asset case and therefore, the debtor's pre-petition estate does not need to be administered or protected by the jurisdiction of this court because the interests of other creditors are not implicated. *See In re Texaco, Inc.,* 89 B.R. 382, (Bankr.S.D.N.Y.1988).

## CONCLUSIONS

1. This court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

2. Because this court finds that the state court findings collaterally estop the debtor as to the ultimate facts at issue, and because the plaintiff relies solely upon the these findings and any undisputed facts in his complaint and affidavit, this court holds that there are no disputed facts as to the nondischargeability of the plaintiff's claim and that summary judgment may be granted in favor of the plaintiff.

3. The plaintiff's claim is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) as a result of the debtor's fraud and defalcation while acting in a fiduciary capacity.

4. The automatic stay terminated upon the debtor's discharge and the plaintiff may proceed in the state court with the state court ordered accounting.

SETTLE ORDER on notice in accordance with the foregoing findings of fact and conclusions of law.